## THE WHITLIEBURN.

(District Court, S. D. New York. July 27, 1898.)

JETTISON—CRANKNESS OF NEW SHIP — TOP-HEAVY LOADING — BALLASTING—HARTER ACT.

On claim to damages for jettison of part of a cargo of case oil, made necessary by top-heavy loading of a new ship and insufficient ballasting, *held* (1) that the risks of loading for a first voyage fall on the owner, and not on the charterer or shipper, who are guarantied seaworthiness in all respects at the time the ship sails; (2) that the Harter act does not release the owner's previous liability in this regard, but by its first section confirms it; since the proper ballasting of a light cargo is a necessary part and incident of the "proper loading and storage" of cargo.

Black & Kneeland, for libelant.
Seward, Guthrie & Steele and C. A. de Gersdorff, for claimant.

BROWN, District Judge. The ship Whitlieburn of 1,874 tons net register and loaded with 86,600 cases of petroleum oil, during heavy weather on December 25 and 26, 1895, when 12 days out, on a voyage from Philadelphia to Japan, jettisoned 3,218 cases, of the

alleged value of $4,719.20. The above libel was filed by the insurers of the cargo to recover the amount paid to the assured, on the ground that the jettison was made necessary by the negligent stowage of cargo and the insufficient ballasting of the ship. The answer denies any negligence or insufficiency of ballast, and alleges heavy weather and sea peril to be the proper cause of the loss; that the ship was seaworthy when loading began, and that if there was any negligence in loading or in ballasting it was done under the supervision and inspection of the charterers, and by stevedores nominated by them, and was part of the "management of the ship" within the exemptions of the third section of the Harter act, which formed a part of the conditions of the bills of lading.

1. The evidence leaves no doubt that the ship as loaded was tender. The pilot who took her out so stated to the captain on leaving her. According to the protest, in a gale on December 20th "she lay well over, and took large quantities of sea water on board." In a squall on the 24th of December she was thrown on her beam ends, but soon righted, without shifting her cargo. After this she was run before the wind several hours, "with much water aboard and burying herself"; "for the sake of all concerned," early on the 25th she was brought to the wind on the port tack, "lying with the lee boats in the sea"; the crew took to the rigging; three were washed overboard, of whom one was drowned; at 7:30 a. m. on consultation it was determined to jettison a part of the cargo, and the upper cases in the 'tween-decks were thrown overboard, after which the ship pursued her course without special difficulty.

The ship was not tender in her model or construction, but of the usual build in modern ships of her class. In herself she was in all respects seaworthy. This was her first voyage. She came from Glasgow with 1,800 tons of ballast, and before loading with oil, she discharged all her ballast except 100 tons of stone, which was left as ballast in her limbers. The evidence shows that 100 tons of ballast is usually sufficient for such cargoes in vessels of the same general description as the Whitlieburn. Some can carry such cargoes without any ballast. The master judged that 100 tons of ballast would be sufficient for the cargo taken aboard, which made her draft 1½ inches less than her load line. Other experts examined on the trial considered 100 tons of ballast sufficient, judging from the general plan and model of the ship, as well as from her previous behavior. Yet that amount of ballast was plainly insufficient for the Whitlieburn with the cargo which she took on board. The cargo filled her lower hold and all the 'tween-decks except a space sufficient for about 1,500 cases in the latter.

The testimony showing that different amounts of ballast are required for such cargoes by different ships of the same general plan and model, also sufficiently shows that a mere general observation of a ship's measurements and cargo spaces, is not sufficient to determine the necessary amount of ballast with any accuracy; though it is quite probable that the necessary amount may be ascertained by careful computations based on the ship's measurements and the bulk and weight of the proposed cargo. In the absence

of any such careful ascertainment, or any previous specific trial of the ship, it would seem to be the reasonable duty of the owner and master on a first voyage in taking a light and tender cargo like case oil, to keep well within the line of safety, as respects ballast and loading; and to bear the risk of any uncertainty in these regards. Such a risk certainly cannot fall upon the shipper or charterer; especially not in a mere charter of affreightment, like the present, where the ship is guarantied to be "tight, staunch and strong, and in every way fitted for the voyage." This guaranty speaks from the time the ship sails, and makes the owners responsible for her seaworthy condition, not as regards her hull and equipment alone, but also as respects ballasting and the loading and stowage of cargo. Sumner v. Caswell, 20 Fed. 249; Bowring v. Thebaud, 5 C. C. A. 640, 56 Fed. 520.

2. The Harter act (2 Supp. Rev. St. p. 81) does not exempt the ship or owners in this case. Had the ship in her loading and ballasting been perfectly seaworthy, as she undoubtedly was in her hull and equipment, and had the jettison been not only a mistake but legally unjustifiable, the third section of the Harter act might have covered the case, as damage arising on the voyage from fault in the "management of the ship"; since the jettison, though unnecessary, would still have been made for the purpose of relieving and preserving the ship and all interests concerned. The Glenochil [1896] Prob. 10. But here the jettison was made necessary by the unseaworthy condition of the ship, consequent entirely upon the mode of loading, stowing and ballasting before she sailed. If this can be called "management of the ship" at all, it is in a remote sense only, and not in the sense in which that phrase is used in the Harter act. On the contrary, the loading, stowing and ballasting of a light cargo are all so interdependent on one another, as affecting the seaworthiness of the ship, that they all fall under the first section of the act, which expressly confirms the owner's previous responsibility; and to cases which fall under the specific provisions of the first section, the general exemptions of the third section are not applicable. Worsted Mills v. Knott, 76 Fed. 582, 584; The Colima, 82 Fed. 665.

The first section of the Harter act expressly declares that it "shall not be lawful for the owner to insert in any bill of lading or shipping document any clause, covenant or agreement, whereby he shall be relieved from liability for loss or damage arising from negligence, fault or failure in proper loading, stowage," etc., "* * * of any merchandise," etc. The "proper loading and stowage" of cargo clearly include not only the proper distribution of the cargo itself, but the ballasting necessary to accompany it in order to prevent the vessel from being top-heavy and unfit for sea. With a light cargo its amount and distribution in "proper loading and stowage," are so dependent, as I have said, upon the amount and location of ballast, that ballasting becomes a necessary part and incident of loading.

Decree for libelant with costs.