THE ONEIDA.

(District Court, S. D. New York. May 6, 1901.)

1. SHIPPING—CARGO DAMAGE—UNSEAWORTHINESS DUE TO IMPROPER LOADING—
   HARTER ACT.
   Neither section 1 nor 3 of the Harter act relieves a shipowner from
   responsibility for the unseaworthy condition of the ship, due to her im-
   proper loading, which renders her topheavy and unstable to such an
   extent as to make her unfit to encounter the ordinary perils of navigation
   which should reasonably have been anticipated during the voyage.

2. SAME—UNSTABLE SHIP.
   A steamer was so improperly loaded as to render her topheavy and of
   slight stability of equilibrium, and to give her a decided list, when she
   commenced her voyage. During the voyage the list shifted from star-
   board to port, and back again, although she encountered no weather more
   severe than should reasonably have been anticipated at that season, and
   finally became so great that the master put into an intermediate port.
   While lying at a pier, and while the master was removing cargo from a
   side port to enable him to load more coal in the lower hold, the ship
   rolled over, bringing the open port under water, and she filled and sank,
   damaging her cargo. Held, that, even if the manner of shifting cargo was
   negligent, and the immediate cause of the disaster, and even if it could
   be considered a fault in the "management of the ship," within the mean-
   ing of the Harter act, yet it was not negligent in itself, but was rendered
   so only because of the unstable condition of the vessel, which must be
   considered the essential cause of the damage, and one for which the
   owner was responsible.

3. SAME—GENERAL AVERAGE.
   See note at end of case.

In Admiralty. Suit to recover for cargo damage.

Butler, Notman, Joline & Mynderse and F. M. Brown, for libelant.
Robinson, Biddle & Ward, for respondent.

BROWN, District Judge. At 4 a. m. of Monday, September 21,
1897, the steamship Oneida, then on a voyage to Boston from Jack-
sonville and Charleston, loaded with lumber and cotton, turned her
course to New York in order to right a list, which had increased
from the time the steamer left Charleston to about 22° to star-
board, so that the master feared to continue the voyage. She ar-
rived at New York at 7 a. m., was docked, stern in, on the lower
side of pier 29 East river. By removal of some cargo from her upper
between decks, the starboard list was reduced to 7°–8°. To gain
access to the coal bunkers so as to load more coal for greater weight
in the lower hold, a cargo port was opened in the lower between
decks on the port side, and while hauling out cargo by means of a
derrick set up at the edge of the cargo port, a sudden lurch of the
ship to port carried the port opening below the water line, causing
the steamer to fill and sink, to the damage of the cargo, for which
the above libel was filed.

The Oneida was 200 feet long by 31 feet beam, built in 1885 with
but two decks above the hold. In April and May, 1897, a few months
before this accident, an additional deck, 6¾ feet above the former
upper deck was put in for additional cargo, thus giving her an upper
and a lower between deck. At Jacksonville on the voyage in ques-

tion she was partly loaded with lumber, cypress logs and a little general merchandise, by which the hold and between decks were each partly filled. At Charleston no cargo was discharged and all the remaining cargo space was filled with cotton, domestics, lumber and some general merchandise; the fresh-water tank in the hold was full, and 125 tons of coal in the bunkers of the hold.

On leaving Charleston at 6 a. m. of September 18th, she had a list to starboard of 8°–9°. In the evening of the same day, or the next morning (the master and mate disagree on that point) the vessel rolled over and took an equal list to port during an alleged S. E. squall. The list gradually increased until 10 a. m. of the 20th, when in an alleged N. W. squall she turned again to starboard with a list of 15° which increased gradually to 22° on the morning of the 21st, when the master turned her course to New York as above stated. I say "alleged" squalls, because the differences in the testimony of the master and the mate, the undoubted inaccuracies and misleading statements in the protest, and the differently shaded ink in which certain entries relating to the list, wind and squalls are made in the log, detract from the full credit which might otherwise be due to the defendant's contention on this point.

It is unnecessary, however, to determine the fact in that regard, because I am entirely satisfied from the behavior of the ship and the testimony of the libelant's expert, that the steamer on leaving Charleston was not in a fit condition to encounter the ordinary sea perils likely to be met on a September voyage, and that this unfitness arose from improper loading and inattention to the position of the heavy-weight cargo, having reference to the alteration in the ship and the addition of an upper between decks which was filled with cargo. The remark of the witness McLean that the vessel would be "safe" had reference only to not sinking from a mere list, though she might be wholly unfit in that condition to be navigated. The effect of this on the stability of the ship was the same as if all the upper between decks cargo had been loaded and properly secured on the upper deck of the steamer as originally built. The computations and drawings of the expert and his testimony indicate that the steamer on leaving Charleston had probably a negative metacentric height, and this best accords with her three subsequent changes. As the precise weights and all the different positions of the cargo are not ascertainable, some parts being tons of measurement instead of weight, and as the discrepancies as respects draft show that the data for computing the metacentric height are not exact, its precise position is not determinable; but making all allowance for any such uncertainties, it appears that any possible positive metacentric height was too small for reasonable stability on the voyage.

In the stowage and distribution of cargo weights, therefore, I must find the steamer unseaworthy, through instability and topheaviness in loading on leaving Charleston. This defect was the primary cause of all that followed. There was no such subsequent weather as to cause either shifting of cargo or such lists in a properly loaded ship. Neither the alleged gales nor the slight settling of cargo is

adequate to explain the heavy and repeated lists; nothing but top-heaviness and the consequent slight stability of the ship can explain them.

The Harter act I think does not afford the defendant relief. Its first section leaves as before, and confirms, the ship's absolute responsibility for any faulty stowage of cargo (The Whitlieburn [D. C.] 89 Fed. 526; The Germanic [D. C.] 107 Fed. 294); and even under the third section, the owner cannot claim "due diligence" to have been used to make the ship seaworthy, where there is negligence of his employés, whether of his land force or of his sea force, before the vessel leaves port (Farr & Bailey Mfg. Co. v. International Nav. Co., 181 U. S. ——, 21 Sup. Ct. 591, 45 L. Ed. ——).

Even if some indiscretion or negligent act in the precise manner of endeavoring to cure the list at pier 29 were regarded as the immediate cause of the damage, by producing the last list to port; and even if that act could be held to be an act of "management of the ship," because designed for the ship's relief, still that act and the attempted mode of relief at pier 29 were very ordinary and harmless acts, if considered independently of the state of the ship. It is only by considering those acts in connection with the great instability of the ship that they can be regarded as negligent at all; so that evidently it was that extremely unstable condition of the ship that was the essential factor in producing the damage, and that alone which made the later acts harmful. The Manitoba (D. C.) 104 Fed. 145.

Decree for the libelant with costs.

### Note.

GREENSHIELDS, CORVIE & CO. v. J. H. BACHMANN and Others.

1897 Hanseatische Gerichts-Zeitung 81.

(Translation.)

PER CURIAM. The defendants are receivers of the cargo of the plaintiffs' steamer Knight of St. John, which on the 29th of December, 1894, sailed from New Orleans with a cargo of wool bound for Bremen. On the voyage the steamer took a list first to port and then to starboard. To avoid the danger of capsizing the captain decided to put into Bermuda as a port of refuge.

After the cargo had there been restowed and ballast taken in, the voyage was continued and terminated without accident.

The plaintiffs seek to bring into a general average adjustment the expenses consequent upon bearing away to Bermuda and upon the stay of the vessel in that port. According to the adjustment, the sums mentioned in the complaint fall upon the defendants. The latter have denied that this is a proper case of general average, contending that an actual present danger to the ship did not attend the continuation of the voyage, the putting into a port of call having occurred through excess of caution; finally, that the cargo was not properly stowed, and that the ship at the time of her departure was not in a seaworthy condition, since she lay over upon her side without any unusual occurrence.

The complaint was dismissed by the Obere Lands Gericht on the 1st of February, 1897, upon the following grounds:

The parties are agreed that, in spite of the heavy list of the steamer Knight of St. John first to port and then to starboard, which list, according to the protest, continually increased, there was no direct danger of capsizing; that putting into Bermuda as a port of refuge was therefore unneces-

sary; and that the voyage might have been continued without imperiling the ship and cargo.

In the well-considered depositions of Palmers Ship Building Company in Yarrow and of Naval Architect West in Liverpool, taken on behalf of the plaintiffs, the metacentric height, which is the measure of the degree of stability of the ship, has been calculated and determined; it appearing that the height so determined, with reference to the draft of the ship and the manner of stowing her cargo, which is not to be overlooked, was sufficient. The stability of the ship at the beginning of the voyage, nevertheless, appears to have been very small, and the ship, therefore, was very tender. At the same time the testimony is that the vessel was seaworthy so far as stability was concerned, and that, with the consumption of coal on the upper deck and in the upper bunkers, the metacentric height, and consequently the stability of the vessel, would gradually and continuously increase.

If, upon this evidence, it is to be concluded that there was no danger, objectively considered, for ship and cargo, nevertheless, since the captain decided to seek a port of refuge, it does not follow that the deviation is not to be looked upon as an act of a general average character.

A case of general average occurs when sacrifices are made, or a port of refuge sought, in order to avoid a common danger, threatening both ship and cargo. The decision of the question, however, whether in the concrete such a danger does exist and is to be deemed sufficiently serious, must be left to the intelligent judgment of the master. On the one hand, indeed, acts undertaken from overanxious caution to avoid fancied dangers or merely out of considerations of expediency form no basis for general average. On the other hand, the limits of human foresight and the uncertainty as to what the outcome of any particular occurrence will be, render impracticable any purely objective standard in determining when a danger is present.

In case, therefore, the shipmaster in a critical position believes that a serious danger threatens, and takes measures calculated to avoid it, where in doing so no accusation of breach of duty can be made against him, in such case the danger must be deemed an actual one and the conditions necessary to a general average adjustment are present, and cannot be defeated simply because it appears by subsequent investigation that the existing circumstances would not have brought about the disaster apprehended.

It is not to be doubted that this is also the prevailing view of the English law here made applicable as the law of the flag. See Lowndes, General Average, p. 29, ff. and for the corresponding statement of German law, R. O. H. G. 8, p. 298; Id. 23, p. 344.

These general principles of general average, however, are not altered by the York-Antwerp Rules, for rule 10, in accordance with the Liverpool Resolutions of 1890, contains no definition as to when a danger is to be deemed present, and we must therefore fall back upon the law of the country.

Now in the present case it is not to be doubted that according to the principles of the question above stated the master was justified in assuming that there was danger. To judge rightly how far the ship could be inclined and yet retain the power of righting herself, and exactly when the limit of her stability was reached, presupposes that the shipmaster was in a position to calculate the so-called metacenter of the ship and the metacentric height. This requires special technical knowledge which is not to be attributed to the master.

It was therefore natural that the master, with the continually increasing list of the ship, doubted her power to right herself, namely, in case the weather should grow worse, and therefore he feared the possibility of capsizing. He is therefore not to be held culpable because under these circumstances he made for a port of refuge in order to make the ship stiffer by restowing her cargo and taking on ballast.

Although otherwise there may be here a proper case of general average, nevertheless if the danger, in averting which expenses were incurred by the plaintiffs, was brought about in consequence of a fault attributable to them they are not in a position to exact from the defendants, as cargo owners, any contribution under a general average adjustment.

This is also a well-established principle in English law.   Lowndes, pp. 28, 34.

Now it seems clear from the foregoing considerations that no fault is to be attributed to the master in seeking a port of refuge under the existing circumstances, but that, even though there was no danger considered from a purely objective point of view, nevertheless he was entirely justified in assuming that such a danger existed.   Nevertheless the fact that the ship came into such a position that danger was to be apprehended for the vessel and cargo is a fault to be attributed to the plaintiffs.

In this case it is shown on the part of the plaintiffs that the captain was making his first voyage with the ship and had as yet no exact knowledge of her qualities.

If the fact was that the captain at the time of his appointment received no instruction from the owners as to the qualities of his ship, particularly as to her tender model (instructions which ought to have been given him), or if the fact was that he knew her qualities, but paid no sufficient attention to them, in the one case as in the other, there was a defect which could have been and ought to have been avoided by proper care and by taking suitable precautions in the manner of loading the ship, by means of which a lower center of gravity, and therefore a greater stability, could have been attained.   That this was possible appears, without further proof, from the fact that through restowing of cargo and taking on of ballast in the port of refuge a greater stability was actually attained, and the ship afterwards had no list.

It follows, therefore, that the peril which intervened is to be attributed to want of proper care in the loading and stowing.   For such failure, however, the shipowner is responsible, and from the consequence of negligence "in proper loading, stowage," etc., he cannot escape liability in accordance with the provisions of the American act of congress of the 13th day of February, 1893 (the so-called "Harter Act") which provisions are conclusive in respect of the question of his liability.   Even if, in accordance with the proofs of the parties, the defective stowing of the cargo of the ship did not, according to a purely objective standard, give rise to unseaworthiness of the vessel, nevertheless it is sufficient, in order to establish the fault and liability of the plaintiffs, that the ship was brought into a position in which the master was justified in supposing the vessel to be unseaworthy.

Since there is here no question as to any "faults or errors in navigation and management of the vessel," for which, under the Harter act, the shipowner is not liable in case his duty is fulfilled of using due diligence in loading the cargo and preparing the ship for the voyage, especially as there was here a fault as to the manner of loading, it follows that in no wise can any claim be made to impose upon the other interests their respective shares in general average.