## THE ONEIDA.

(Circuit Court of Appeals, Second Circuit. March 21, 1904.)

No. 78.

1. SHIPPING—DAMAGE TO CARGO—BURDEN OF PROVING SEAWORTHINESS.

In a suit to recover for loss of cargo by the sinking of a ship, the burden of proving seaworthiness at the beginning of the voyage rests upon the shipowner.

2. SAME—SEAWORTHINESS—INSTABILITY DUE TO IMPROPER LOADING.

A vessel cannot be said to be seaworthy for a voyage where, at its inception, she has little, if any, metacentric height, and a list of 8 or 9 degrees, and her cargo weight is so distributed that her instability must increase as she proceeds from the consumption of coal and water.

3. SAME—HARTER ACT.

A ship started on her voyage with a list of 8 or 9 degrees, which increased to such an extent, in consequence of her improper loading, that it was imprudent to proceed, and she put in at an intermediate port. Having opened a port to readjust the cargo while lying at a pier, the ship gave a sudden lurch, which brought the port under water, and she sank, damaging the cargo. *Held*, that the damage was attributable to her initial instability, which rendered her unseaworthy at the beginning of the voyage, and for the consequences of which the owners were not exempted from liability by the Harter act.

4. SAME—MEASURE OF DAMAGES—VALUE OF DAMAGED CARGO.

A ship carried a cargo of cotton from Charleston to New York, from which place it was to be forwarded to Liverpool, but under a separate and independent contract of affreightment. The bill of lading provided that in case of loss or damage the value of the cotton in Charleston at the time

---

¶ 1. Implied warranty of seaworthiness, see note to The Carib Prince, 15 C. C. A. 388.

See Shipping, vol. 44, Cent. Dig. § 482.

¶ 3. Statutory exemption of shipowners from liability, see note to Nord Deutscher Lloyd v. President of Insurance Co. of North America, 49 C. C. A. 11.

of shipment should be taken as the basis for computing the damages. The cotton was damaged before its delivery in New York through the unseaworthiness of the ship. *Held,* that the contract of carriage terminated in New York, and the ship was entitled to credit for the value of the cotton in its damaged condition in that market, and not in the Liverpool market, and that it was error to give credit for the proceeds of its sale in Liverpool, less the freight from New York, the amount being materially less than would have been realized by its sale in New York.

**5. SAME—ERROR OF SURVEYORS—ESTOPPEL.**

The cotton was shipped to Liverpool for sale in compliance with the recommendation of the surveyors who adjusted the loss, and with the knowledge of the shipowners, who made no objection. *Held,* that they were not bound by the erroneous decision of the surveyors, nor estopped to claim credit for the New York value of the cotton, where they at no time gave a positive assent to the substitution of the Liverpool value.

**6. SAME—MEASURE OF DAMAGES.**

Under a bill of lading for cotton to be carried from Charleston to New York, which provided that loss or damage to the cotton should be computed on the basis of its value at the time and place of shipment, where it was delivered in New York in a damaged condition, the shipowner is not entitled to have the amount of the freight deducted from its value as ascertained pursuant to such provision.

Appeal from the District Court of the United States for the Southern District of New York.

This is an appeal by the Clyde Steamship Company, as claimant and owner of the steamship Oneida, from the final decree of the District Court of the Southern District of New York, in favor of the libelant, entered February 17, 1903, for the sum of $40,112.82. The libelant, J. Raymond Smith, is assignee of the owners and underwriters of the cargo of the Oneida which was damaged by reason of the sinking of the ship at Pier 29, East river, New York, on September 21, 1897. The opinion of the District Court holding the Oneida liable is reported in 108 Fed. 886.

Henry Galbraith Ward and Charles H. Hough, for appellant.

Wilhelmus Mynderse, for appellee.

Before WALLACE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge. We concur in the conclusion of the District Court that the Oneida was unseaworthy when she left Charleston. A few words only need be added. The burden was upon the claimant to show that the vessel was in a fit condition to transport the cargo undertaken to be carried; in short, that she was seaworthy. The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. ——. This burden has not been sustained. The Oneida was not in a fit condition to carry her cargo to Boston, Mass., having in view all the conditions reasonably to be expected during the voyage. At the time she broke ground she had a starboard list of eight or nine degrees and within 24 hours thereafter she rolled over and took an equal list to port. This list increased until the morning of the 20th of September when she again turned to starboard with a list of 15 degrees, which was gradually increased, and at one time reached 24 degrees. This condition cannot be accounted for either by the state of the weather or the slight shifting of the cargo. The instability indicated at Charleston steadily increased as the ship continued her voyage. In the nature of the case this was inevitable and must have been known to her master at the time. The coal and water

were stowed below the center of gravity and as these were consumed the tendency to become topheavy increased. It cannot be said that a vessel is in a seaworthy condition which has at the inception of her voyage, little, if any, positive metacentric height, a list of eight or nine degrees, and her cargo weight so distributed that her instability must increase as she proceeds. Perhaps the most persuasive proof of her inability to reach her destination safely is found in the fact that the list increased so rapidly that on the morning of the 21st, when there was a starboard list of 22 degrees, her master, fearing that she would be unable to reach Boston, put into the port of New York in distress.

The subsequent disaster which overtook the Oneida can be traced directly to the improper distribution of the cargo at Charleston. The sequence of events leaves little room for doubt regarding this proposition. The faulty loading produced a list which necessarily increased as the vessel proceeded. Increasing instability made the completion of the voyage imprudent. The danger of continuing made deviation a wise precaution. In order to readjust the cargo it became necessary to open a cargo port in the lower between decks. Opening the port, followed by the sudden lurch of the ship, caused the damage to the cargo. Thus the damage can be traced directly to the initial instability. This was a fault from the consequences of which the ship is not relieved by the provisions of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]). The Southwark, supra, and cases cited; The Germanic, 124 Fed. 1, 59 C. C. A. 521; The C. W. Elphicke, 122 Fed. 439, 58 C. C. A. 421; The Manitou (D. C.) 116 Fed. 60, affirmed (C. C. A.) 127 Fed. 554.

The claimant contends that there was error in ascertaining the damages, in respect to the foreign shipments, by taking into consideration the value of the cotton at Liverpool rather than at New York where the claimant's contract of carriage ended; New York having been substituted for Boston by agreement. The claimant also insists that it was error to allow the libelant coastwise freight on the cotton from Charleston to New York and ocean freight from New York to Liverpool. The commissioner commenced his computation by fixing the value of the cotton at the amount stated in the invoice. Both parties appear to be content with this basis of computation, at least there is no exception challenging its accuracy. The bill of lading contains the following clause:

"In ascertaining the amount of such damage, the same shall be computed at the value or cost of the said goods or property at the time and place of shipment."

The parties differ as to the proper construction of this language, but not in the particular now under consideration, and we start, therefore, with the assumption that the cost or value of the cotton at the place of shipment is correctly stated. Should the ship have received credit for the value of the cotton at Liverpool or New York? Seventy-three bales of damaged domestic cotton were sold in New York for $28.88 a bale, a very much higher price than was obtained in Liverpool. We think the contract with the Oneida simply contemplated a carriage of the goods to Boston, there to be delivered to a separate and wholly

128 F.—44

independent carrier. When this delivery was made the obligation of the ship terminated. In other words the port of Boston was the place of destination as between those parties and there the value of the goods in their damaged condition was to be ascertained irrespective of the fact that the owners had contracted with a separate carrier to convey them to Liverpool. Especially is this true in a case where the through voyage was broken up by the refusal of the subsequent carrier to receive the goods in their damaged condition. But New York was by the request of the owners substituted for Boston and the reciprocal rights and obligations of the parties must be considered as they accrued at the former city. Marshall v. N. Y. C. R. Co., 45 Barb. 205, affirmed 48 N. Y. 660. The claimant was, therefore, entitled to credit for the value of the cotton at New York unless it or its agents agreed to the contrary. It was the opinion of the surveyors that the cotton should be forwarded to Liverpool for sale. Mr. Putnam testified as follows:

"It was my opinion, based on the Liverpool market, that it was desirable to forward the cotton to Liverpool. New York is a large market for damaged cotton; it is a good market; New York and Philadelphia. Personally I know nothing about the market in Liverpool for damaged cotton. There are large quantities of damaged cotton sold in Liverpool, probably more than in New York, and it is supposed to be a better market for damaged cotton than New York. * * * When I stated to Messrs. William P. Clyde & Company that it was advisable to send the damaged cotton to Liverpool under through bills of lading they didn't object to it at all, they didn't make any effort, they tried to do it. * * * I know of no interest they had in the cotton after delivery under through bill of lading to Boston. * * * If, in point of fact, it appears that the cotton that was forwarded to Liverpool sold at very much lower rates it simply indicates an error, in my judgment, in having it go forward."

Mr. Coe, an average adjuster, testified:

"The damaged cotton was delivered to the underwriters against their guarantees, and they had the sole control and disposition of it."

The cotton went forward with the full knowledge of Clyde & Co., and it is true that they did not object, but we fail to find that they assented to the proposition that the value of the cotton was to be ascertained with reference to the Liverpool market and that the entire expense of getting it there was to be borne by them. The contention of the libelant is that the claimant's rights were entirely in the hands of the surveyors and that the claimant was remediless no matter how ill-advised their recommendations might be or how disastrous the consequences, provided they were made in good faith. "If the surveyors," says the brief, "had reported that the damaged cotton could be sold to the best advantage in Kamchatka, it would have been quite proper to send it there for sale, and the expenses of the transportation would be a charge against the proceeds of the sale." It would seem to follow as a natural conclusion from this contention that the insurers and owners were at liberty to convey the cotton from port to port until one was found where market conditions were favorable, and always at the expense of the claimant. We cannot accede to this view.

There is force in the suggestion that when the cotton was forwarded all parties expected a general average in which event the adjustment would have been made with reference to values and losses at New

York. This is evidenced, inter alia, by the indemnity agreement, dated September 27, 1897, which the underwriters gave to the Oneida. The first and third clauses are as follows:

"First: To protect, indemnify and hold harmless the said steamer Oneida, her owners, agents and all concerned therein, from and against any claim or demand that is or may be made for any damage or loss that may be claimed to have been caused by the deviation or change of route aforesaid. This agreement not to prejudice any claims which the owners, shippers or underwriters of said cotton may have by reason of occurrences prior to the date hereof. * * * Third: To pay upon demand such proportion of general average, salvage and special charges on said cotton, sound and damaged, as may be found to be due on adjustment."

In view of all the circumstances and conditions, we do not think that the mere acquiescense of the agents of the claimant in the forwarding of the cotton to Liverpool binds the claimant to the extent of charging it with the entire loss attributable to an act which is now conceded to have been a serious mistake. The cotton did not belong to claimant. Even had an objection been made there was no power to enforce it. The case presents no elements of an estoppel. The owners saw fit to send the cotton to a foreign market but this does not change the rule of damages in the absence of an agreement express or implied that such was the intention of the parties. It follows, of course, as a corollary of the foregoing that the claimant should not be charged with the ocean freight.

The failure to object to the substitution of the Liverpool market for the New York market did not operate to bind the claimant to the large outlay necessary in order to get the goods to the former market. Something more than mere silence was necessary to produce such an obligation. Not only is there no evidence that the claimant agreed that it would pay the ocean freight but on the contrary the record shows that the claimant at all times expected to be paid for the service. Clyde & Co. rendered their freight bill to Johnson & Higgins and at no time waived their right to be reimbursed for the outlay thus occasioned. The libelant relies solely on a negative acquiescence where an affirmative promise is required.

The only remaining exceptions, necessary to be considered, are those challenging the action of the commissioner in adding the coastwise freight, paid the claimant, to the invoice value, thus depriving the claimant of the freight earned in carrying the cotton from Charleston to New York. Were this an ordinary action at common law, with no express stipulations between the parties regulating the measure of damage, the ruling of the commissioner in this regard could not be sustained. The rule governing such cases is well stated as follows:

"The damage sustained by the plaintiff from the failure to perform this contract was clearly the value of the apples in New York at the time they should have been delivered, pursuant to the contract, in the condition the defendant undertook to deliver them, less the price to be paid for the service." Sturgess v. Bissell, 46 N. Y. 462; Rodoconachi v. Milburn, 18 Q. B. D. 67.

In the present case, however, the parties have seen fit to agree to compute the damage in case of loss at the value or cost of the property at the place of shipment, and there is much force in the argument that, in such circumstances, the shipper should not lose the amount paid for

freight. We are not disposed to interfere with the action of the commissioner in following a rule which has long been established in the admiralty courts. Pearse v. Quebec S. S. Co. (D. C.) 24 Fed. 285; The Lydian Monarch (D. C.) 23 Fed. 298.

It follows that the decree must be reversed, without costs in this court, and the cause remanded to the District Court with instructions to compute the damages in accordance with this opinion.

WALLACE, Circuit Judge (concurring). In concurring in the opinion of the court I deem it proper to state the reasons why, as it seems to me, the ship, and not the cargo owner, should bear the part of the loss represented by the freight upon the damaged goods from Charleston, the place of shipment, to New York, the substituted place of delivery.

The general rule is that, in case of a loss of the goods, the carrier is liable to the shipper for their market value at the point of destination, less the amount of the freight charges due for their transportation; and the same rule applies where the goods are merely damaged, and are delivered in their damaged condition, with the qualification that the value of the goods in their damaged condition is to be deducted. Presumably the cost of transportation to the place of destination is an element of the market value of the goods at that place; and when the shipper recovers their market value, or upon the basis of their market value at that place, he obtains full indemnity. As the shipper thus gets the benefit of the transportation, the carrier should not lose the freight. In the present case, however, the general rule is deflected by the peculiar condition in the bill of lading. That condition was as follows:

"It is further mutually agreed that in case any loss, detriment, or damage is done to or sustained by any of the goods or property herein receipted for during transportation, * * * in ascertaining the amount of such damage the same shall be computed at the value or cost of said goods or property at the time and place of shipment."

Obviously, this clause cannot be construed literally, as it would be preposterous to suppose that the parties intended that, in case of a partial or even a trifling damage, the loss should be estimated at the whole value or cost of the goods. In reason it must mean either that the damage recoverable shall not exceed the cost or value of the goods at the time and place of shipment, or, alternatively, that as a basis for computing the damages their cost or value at the place of shipment is to be substituted for their market value at the place of destination. The language is more consistent with the latter meaning. The clause was probably inserted for the benefit of both parties, and to relieve either from the chances of an excessive loss arising by abnormal fluctuations in the market value of the goods occurring after the time of shipment, and whereby the market value at the time of delivery might be much higher or much lower than at the time of shipment, or than ordinarily. Reading it as intended to eliminate an element of uncertainty in estimating possible loss, it can be given due effect without burdening the shipper with the cost of the transportation of the goods. Under a bill of lading like the present the shipper's loss

is fairly measured by the difference between the cost or value of the goods at the time and place of shipment and their value in their damaged condition at the place of delivery, together with the expenses incurred for their transportation. The carrier really obtains the benefit of the transportation, and the shipper does not, because, applying this rule of damages, the carrier is allowed the value of the damaged goods at their place of delivery. There is no justice in requiring the shipper to pay for a benefit which inures wholly to the carrier.