## THE G. B. BOREN.

(District Court, S. D. New York. October 26, 1904.)

1. SHIPPING—DAMAGE TO CARGO THROUGH SINKING OF BARGE—UNSEAWORTHINESS FROM OVERLOADING.

A barge which sank at a dock, after loading a cargo of bricks, *held* liable for the damage to the cargo on the ground of unseaworthiness due to overloading.

2. SAME—LIEN FOR CARGO DAMAGE—LACHES IN ASSERTING.

The owners of a cargo of brick with which a barge sunk in Hudson river, and which remained in the river from November until spring before they could be recovered, did not, by delaying the making of a formal claim for damages against the vessel until after she had been raised and the cargo recovered, so that the extent of the loss could be definitely known, lose the right to assert a lien therefor as against the insurer of the barge, which in the meantime had bought and raised her, such purchaser having knowledge that there would be damage to the cargo, and being chargeable with notice of the legal rights of the owners.

In Admiralty. Action to recover for damage to cargo.

Howard Chipp, for libellants.

James J. Macklin, for claimant.

ADAMS, District Judge. This action was brought by Lucien H. Washburn and John T. Washburn, the owners of 375,000 brick loaded at Kingston on the Hudson River, on the barge G. B. Boren, on the 4th day of November, 1902, for transportation to, and delivery in New York City. The barge was loaded at the libellants' brick yard at East Kingston, by certain employees of the libellants, whose wages were subsequently paid by the barge owners, under the directions of the master of the barge. She was then towed to Kingston Point where she was tied up, in company with some other barges, to await the tug boat which was to tow her to New York the following morning. During the night she sank, causing considerable injury to the cargo of brick, and liability for such damage is the subject of this inquiry.

The libellants contend that the sinking was caused by unseaworthiness and leakage caused by the negligence of the master in neglecting to pump and in leaving the barge with no one aboard for many hours, without any stress of weather, during a calm night.

The claimant, the Home Insurance Company, denies any unseaworthiness but alleges that the barge was in good order and carefully attended to and was all right up to midnight, when a large steamboat passing down the river, proceeding at a high rate of speed, caused the swells or suction to bound or pound the barge against the dock, breaking her moorings; that soon thereafter it was discovered that she was leaking and, notwithstanding all proper efforts to keep her afloat, she sank with her cargo. A further defence is put forward that no claim was made for any damages until long after the claimant had purchased the barge and incurred great expense in raising her, which it would not have done had it known that any claim would be made and that the claim is stale and can not now be enforced against the barge.

The testimony shows that the barge was staunch and strong, not-

withstanding a slight leak which had been repaired and overcome. She was heavily laden, however, with a freeboard from 2 to 8 inches and signs of listing and unsteadiness were apparent while she was being towed to Kingston Point, where she was to be taken in tow in the morning. She was there placed port side to the wharf where she was somewhat affected by swells from passing steamers, which proved dangerous to her and resulted in her sinking some time during the night or early morning. The swells, however, would not account for the sinking, except in connection with her weakness through over-loading. Other properly loaded barges lay at the wharf that night without injury and it was common for brick barges to withstand the effect of the swells, which were not ordinarily dangerous, owing to the distance at which steamers passed the place, usually on the eastern side of the river, ½ to ¾ of a mile away. It appears that the barge was unseaworthy from her manner of loading and liable for such reason. The Whitlieburn (D. C.) 89 Fed. 526; The Oneida (C. C. A.) 128 Fed. 687.

It remains to be considered whether the second defence should be sustained.

The claimant was insurer of the barge and when she was sunk, sent a representative to Kingston to look after its interests. He was notified by the libellants that they intended to hold somebody responsible for the loss. That was in November, 1902. Some of the bricks were then removed but before much could be done, the river froze over and operations were suspended until the spring of 1903. At the time of the sinking the barge was in the possession of Frank Tague under contract of purchase, dated about August 20th, 1902, with Schoonmaker & Rice. She had been in Mr. Tague's possession about three months during which time he was using her in the transportation of stone from the North River to Sandy Hook and cellar dirt from the East River to Irvington-on-the-Hudson. After the cellar dirt business, she engaged in that in which she was occupied when the accident happened. She had also, before the occupations mentioned, been in the brick business but the testimony does not show what quantities she had carried. The barge was built by Rice & Company, the same Rice as Schoonmaker & Rice, who contracted to sell her to Mr. Tague. They made a sale of her to the insurance company on the 5th day of February, 1903, without advising the company of any claims against the boat although one of the libellants advised Rice that he meant to make somebody pay for the loss, beyond telling the agents of the company that he understood that the Washburns were going to make trouble if they could. He did not advise them specifically that the libellants intended to resort to the boat. The insurance company paid for the barge, full value apparently, and proceeded to raise her, thus incurring further expense.

Upon this state of facts, the claimant contends that the libellants can not recover against the barge.

I can not sustain the contention. There was no reason on the part of the libellants for haste in asserting their rights. The barge and cargo were under water for several months and the amount of loss was not fixed or ascertainable. The insurance company knew that the libellants had suffered some loss from the accident and it was incumbent

on it to take notice of their legal rights and the probability that they would enforce them. In any event, it assumed the risk if the rights should be enforced. It was not necessary that the insurance company should have direct evidence of the claim, which if established would constitute a lien, and the circumstances do not show that the lien was intended to be waived. The Atalanta, 2 Fed. Cas. 73; The Louie Dole (C. C.) 14 Fed. 862.

Decree for the libellants, with an order of reference.