## STEAMSHIP WELLESLEY CO. v. C. A. HOOPER & CO.

(Circuit Court of Appeals, Ninth Circuit. February 6, 1911.)

No. 1,898.

**1. SHIPPING (§ 132*)—LIABILITY FOR LOSS OF CARGO—SEAWORTHINESS OF VESSEL—PRESUMPTION.**

Where disaster overtakes a vessel at the beginning of her voyage, without stress of weather or other adequate cause appearing, the presumption is that she was unseaworthy when the voyage commenced, and the burden rests on the owner to avoid liability for cargo lost or injured to overcome such presumption by showing affirmatively that the ship was seaworthy.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 482; Dec. Dig. § 132.*]

**2. SHIPPING (§ 121*)—LIABILITY FOR LOSS OF CARGO—SEAWORTHINESS.**

A ship is not seaworthy when from her improper loading she is rendered unfit to encounter the ordinary perils of navigation which could reasonably have been anticipated on the projected voyage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 450; Dec. Dig. § 121.*]

**3. SHIPPING (§ 138*)—LIABILITY FOR LOSS OF CARGO—EXEMPTION UNDER HARTER ACT.**

Section 3 of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), which exempts the owner of a vessel from liability for loss or injury to cargo resulting from faults or errors in navigation or in the management of the vessel if he has exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied, applies only to the vessel after the voyage has commenced, and cannot be invoked by an owner to relieve him from liability for cargo lost while the vessel is loading, through the neg-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ligence of those in charge in permitting her to settle on the bottom and list until deck cargo fell overboard.

- [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 138.*

Statutory exemptions of shipowners from liability, see notes to Nord-Deutscher Lloyd v. Insurance Co. of N. A., 49 C. C. A. 11; Ralli v. New York & S. T. S. S. Co., 83 C. C. A. 294.]

4. APPEAL AND ERROR (§ 1011*)—REVIEW OF VERDICT—CONFLICTING EVIDENCE —"FAULT IN NAVIGATION."

A steamer loaded with a cargo of shingles, both below and on deck, as she was being towed out of Humboldt Bay, Cal., where she loaded, on making a turn to enter the jetty listed heavily to port, shifted her deck load, and it was necessary to jettison a part of it before she could be righted. There were no unusual conditions of weather or tide. *Held*, that a finding would not be disturbed made by the trial court on conflicting evidence that the accident was due to the unseaworthiness of the vessel by reason of the manner in which she was loaded, rendering her unstable, and not to a peril of the sea, within the exemption in the bill of lading, nor to a fault in navigation within Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946).

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3983–3989; Dec. Dig. § 1011.*]

5. SHIPPING (§ 131*)—LOSS OF CARGO—DECREE—INTEREST.

An admiralty rule fixing the rate of interest to be allowed on judgments entered on a bond or stipulation for the release of property libeled has no application to a judgment for breach of a contract of carriage, in which case the legal rate of interest of the state may properly be allowed.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 131.*]

6. SHIPPING (§ 131*)—LOSS OF CARGO—DECREE—INTEREST.

The fact that a decree against a shipowner for loss of cargo includes interest to the date of its entry does not make it error to award interest on the entire decree from that time forward.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 131.*]

7. CARRIERS (§ 125*)—ACTION FOR LOSS OF GOODS—EFFECT OF PAYMENT OF LOSS BY INSURER.

The fact that a cargo insurer has paid a loss due to fault of the ship does not preclude a recovery against the vessel owner who is primarily liable therefor, and it is immaterial whether the action is brought in the name of the insurer or of the insured for its benefit.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 552–556; Dec. Dig. § 125.*]

Appeal from the District Court of the United States for the Northern District of California.

Suit in admiralty by C. A. Hooper & Co., a corporation, against the steamship Wellesley, Steamship Wellesley Company, claimant. Decree for libelant, and claimant appeals. Affirmed.

In November, 1908, the steamship Wellesley was at the port of Eureka, Humboldt Bay, Cal., taking on a cargo of shingles which she undertook to transport for the appellee to San Pedro and San Diego. After taking a large portion of her underdeck cargo, at the arm of Humboldt Bay, known as North Bay, she proceeded thence to Fields Landing on the South Bay, where she was to complete loading her cargo. There she took in further cargo, underdeck, and also a full deck cargo. At Fields Landing, the bottom is hard and shelving off shore. After the vessel had almost completed her lading, she ceased loading at about 8 o'clock in the evening. By 5 o'clock on the following morning, while the crew were in their bunks, the tide had receded so far

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that the vessel landed on the bottom. In consequence of grounding, she listed to starboard, parting one of her lines, and discharging part of the deck load. She then slowly righted and listed to port, and discharged about the same number of shingles on the shore side. The shingles so discharged on the shore side were recovered and again stowed on deck, but those discharged on the water side were floated up the bay, where they were subsequently salved. The libelant then furnished new cargo, which was loaded on deck, sufficient to complete the loading. The vessel then proceeded northward, and came to anchor in North Bay, some distance north of the main entrance to the harbor. The channel at the main entrance is protected by a jetty running out into the ocean almost at a right angle with the channels of North and South Bays. The channel in and out of the harbor is narrow, and in proceeding from where the vessel lay in the North Bay out to sea it was necessary to make a sharp turn near the shoreward end of the jetty. On the morning of November 9th, at about two hours before high tide, the tug Ranger took the steamship in tow for the purpose of towing her out to sea. Soon after starting, the master of the tug gave orders to proceed at full speed. When the steamship came to the jetty and was making the turn necessary to pass out, she suddenly listed to port and her deck cargo shifted to port, carrying her over until she commenced to fill, and she finally stood at an angle of 35 degrees. The captain of the Wellesley directed the tug to turn around and tow him back. To save the ship he let go the deck lashings and allowed part of the deck load to go overboard, and he jettisoned a further quantity thereof. The vessel was landed on mud flats at the upper part of the harbor, where much of her cargo was discharged into lighters, after which she was pumped out and some temporary repairs were made. She then restowed her cargo, took on additional shingles to replace some of those which had been lost, and proceeded to her destination, with a deck load materially less than that which she had first attempted to carry. Of the shingles which fell overboard and were jettisoned on November 9th, 1,308,000 were salved by the libelant at an expense of $1,299.40, and the remainder, amounting to 1,455,-250, were a total loss. The libel alleged that on November 7, 8, and 15, 1908, the master of the Wellesley received on board that vessel 7,675,000 redwood shingles, the property of the libelant, agreeing for a stipulated freight to carry and transport the same on such steamship from the port of Eureka, and deliver a part thereof at the port of San Pedro, and the remainder at the port of San Diego, for which he issued shipping receipts or bills of lading, and alleged a shortage of 2,867,250 shingles at the ports of discharge, and alleged, further, an expenditure of $1,299.40 for the salvage of a portion of said shingles and other expenses incident thereto, amounting in all to $1,478.31. The claimant admitted a shortage of 1,455,250 shingles, and pleaded two defenses: First, that the contract provided for the transportation of said cargo, "the perils of the sea and other accidents of navigation excepted," and that it contained a further stipulation that the deck load should be at shipper's risk, and that the general average, if any, should be settled according to the York-Antwerp rules of 1890, and for a second defense pleaded section 3 of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]).

From the oral testimony taken in open court, supplemented by depositions, the court below found that the loss of shingles at Fields Landing was due to the negligence of the captain and crew of the ship in permitting her to ground, and in failing to secure the deck load in case of grounding; that the mishap near the entrance to Humboldt Bay on November 9th was due to the unseaworthy condition of the Wellesley, resulting from her carrying a deck load in excess of her actual capacity in view of the character of the ship and the ordinary perils to be reasonably expected on the projected voyage; that it was not caused by faults or errors in navigation, or in the management of the ship, or by the perils of the seas; that a clause providing for general average according to the York-Antwerp rules had been understood between the libelant and the claimant as applying to all coasting charges entered into between them, whether by written charter party or by verbal agreement, but that the evidence was insufficient to show that it was understood between the parties that the deck load should be at shipper's risk.

Nathan H. Frank and Irving H. Frank, for appellant.

E. B. McClanahan and S. H. Derby, for appellee.

Before GILBERT and 'ROSS, Circuit Judges, and HANFORD, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). The principal question presented on the appeal is whether or not the loss of the cargo of the Wellesley is such as to be covered by the provisions of the Harter act. The appellant contends that the evidence proves the vessel to have been seaworthy, and the accident at the entrance of the harbor to have been the result of bad seamanship, that the perils which caused the accident were the ordinary perils to be reasonably expected on the projected voyage, and that there is no proof to sustain the finding of the trial court that the accident resulted from carrying a deck load in excess of the vessel's actual capacity, but that the proof is that the accident resulted from taking the vessel over the bar at an improper time, against the protest of the master of the vessel, and at an improper speed, and that it was the negligence of the tug, and possibly the concurring negligence of the master of the Wellesley in driving the vessel against an adverse current and attempting a sharp turn into the channel, and not unseaworthiness that caused the accident. In approaching this question, it is important to bear in mind that the accident occurred before the vessel had reached the turbulent waters of the bar, and the significance of the report of the Wellesley's master made two days after the accident, in which he said:

"Herewith I submit you a report on the mishap to Wellesley in Humboldt Bay November 9th, at 10 a. m., as we left for sea with tug Ranger ahead towing us. On arriving off North Spit, the strong flood tide struck us hard on starboard bow, so that she did not answer helm quick enough, and, having the wheel hard aport, she took a heavy list to port, putting bulwarks and port deck under water."

Also the master's protest made on the same date, containing the following:

"While heading out for sea, in coming down between the North and South Spits in the heavy tide rip, the vessel listed heavy to port, and water came over the port bulwarks and port side of decks, so that the vessel could not recover balance," etc.

We think it clear that the accident, occurring as it did, and as thus described by the master, raises a strong presumption of unseaworthiness. The master of the tug had had long experience in towing vessels out to sea at Humboldt Bay. It does not appear that either he or the master of the Wellesley anticipated difficulty at the place where the accident occurred. It is true there is evidence that the master of the Wellesley made some objection to being taken out to sea before high tide, but there is no evidence that his objection was based upon the apprehension of difficulties to be encountered before reaching the bar, which was known to be rough and at times perilous. In The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65, the court said:

"This sudden breakdown when the vessel was scarcely out of port would raise the presumption of unseaworthiness at the time of the sailing, making it incumbent upon the vessel owner to prove seaworthiness, and this independently of the provisions of the Harter act."

In The Arctic Bird (D. C.) 109 Fed. 167, it was said:

"In view of this rule as to what constitutes seaworthiness, it has been uniformly held that if a vessel springs a leak and founders soon after starting upon her voyage, without having encountered any storm or other peril to which the leak can be attributed, the presumption is that she was unseaworthy when she sailed."

In several decisions of the federal courts, the following language of the opinion in Walsh v. Insurance Co., 32 N. Y. 436, has been quoted with approval:

"Where the inability of a ship to perform a voyage becomes evident soon after leaving port, and it founders without stress of weather or other adequate cause of injury, the presumption is that this inability existed before setting sail, and that it is due to some latent defect which rendered the vessel unseaworthy."

It is significant, also, that shortly after the accident 30 tons of permanent ballast were placed in the hold of the Wellesley and boarded over. There was testimony on behalf of her owners that this was done not because of her instability, but to bring her down by the bow. But this evidence is not altogether convincing, for it is shown that about the time when the permanent ballast was placed in the Wellesley a similar amount of permanent ballast was placed in the Bowdoin, a sister ship of the Wellesley belonging to the same owner, and there was testimony that on April 9, 1908, while lying at her loading dock, the Bowdoin suddenly listed and discharged her deck cargo in a manner similar to that in which the Wellesley discharged hers at Fields Landing. Concerning the purpose for which the ballast was put into the Bowdoin, the master of the Wellesley testified that it was partly to increase the stability, and partly to fill up the hold that was not good for anything else, but that the ballast was put into the Wellesley, not for the sake of stability, but to fill up the hold between the ceilings. The president of the appellant testified that:

"The prime reason for putting ballast into the Wellesley was to get the vessel down by the head in going up against the northwest winds; that is the prime reason."

Such may have been the principal reason, but the testimony and the circumstances suggest that another reason was the instability of the vessel. Another significant fact is that, shortly after the accident, the president of the appellant wrote to his brother at Eureka, requesting him to have gathered up all shingles picked up from the Wellesley, and to offer the holders thereof from 25 to 40 per cent. of the proceeds when sold, and directing him to forward the expense bills. Other correspondence followed, which indicates that at that time the appellant understood that it was liable to the appellee for the loss of the shingles. There is also testimony in the record which tends strongly to show that the speed of the Wellesley just prior to the accident was not such that the sudden turn which she made would have caused the accident if the cargo had been properly stowed. Her full speed under ordinary circumstances was eight knots. The tide was running against her at a four-mile rate. It needs no expert testimony to show that in making a short turn under those conditions she would list to some degree. But the testimony of her master and her second mate was that her heel

was about 17 degrees at the time when the deck load first shifted. The testimony of the naval architect called as an expert by the appellant, based as it was largely upon data furnished him by the master of the Wellesley, is not sufficient to convince us that the list was not greater than it should have been under the circumstances, had the cargo been properly loaded. If the entries of the log of the Wellesley are to be taken as correctly showing the precise times at which the vessel passed Red No. 4 buoy and Red Nun buoy, the vessel was proceeding at a rate not to exceed four knots, a speed that might be expected in view of the speed capacity of the vessel and the opposing tide current. The master of the tug testified that 'the Wellesley carried an unusually high deck load, that the conditions were normal in the channel at the time of and prior to the accident, and that at the channel entrance the Wellesley listed first to starboard, and then slowly recovered and listed to port, and went over. His testimony, if true, tends strongly to indicate the instability of the Wellesley resulting from the manner in which her cargo was stowed on deck. Considering all the evidence in the case, we cannot say that the trial court erred in finding that the accident in the channel resulted from the unseaworthiness of the vessel, and we think that, under the well-settled rules of admiralty practice, we are precluded from disturbing the finding thus made upon conflicting evidence, nearly all of which was heard in open court. To avail himself of the protection afforded by section 3 of the Harter act, the shipowner must show affirmatively that the ship was seaworthy. International Navigation Co. v. Farr, 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830; Knott v. Botany Worsted Mills, 179 U. S. 69, 21 Sup. Ct. 30, 45 L. Ed. 90; McCahan v. The Wildcroft, 201 U. S. 378, 26 Sup. Ct. 467, 50 L. Ed. 794. And the vessel is not seaworthy when from her improper loading she is rendered unfit to encounter the ordinary perils of navigation which could reasonably have been anticipated on the projected voyage. The Colima (D. C.) 82 Fed. 665; The Whitlieburn (D. C.) 89 Fed. 526; The Oneida (D. C.)) 108 Fed. 886; Id., 128 Fed. 687, 63 C. C. A. 239; The G. B. Boren (D. C.) 132 Fed. 887.

Nor do we find ground to disturb the finding of the trial court that the accident at Fields Landing was due to the negligence of the master. It is said, as against this finding, that the master made soundings to ascertain the depth of the water at that point, but that fact does not relieve him of the charge of negligence. He was chargeable with knowledge of the depth of the water, the fall of the tide, and the nature of the ground beneath the vessel. Nor was there error in the conclusion of the court below that the appellant cannot claim the protection of section 3 of the Harter act for the loss of cargo at that landing, for it did not result from an error in navigation or in the management of the vessel within the meaning of that act. Ralli v. New York & T. S. S. Co., 154 Fed. 286, 83 C. C. A. 290. In that case the court held that the language of section 3 of the Harter act clearly contemplates a distinction between the preparation for a voyage and the management of the same after it is begun, and that the voyage does not commence until the cargo is on board and the vessel ready to sail. The doctrine of that decision is not discredited, but is to some

extent supported by the language of the opinion in The Germanic, 196 U. S. 589, 25 Sup. Ct. 317, 49 L. Ed. 610, cited by the appellant. In that case the vessel was lying at a wharf discharging her cargo upon one side and taking on coal on the opposite side. She took a list whereby water came in and damaged her undischarged cargo. The court held that the damage was due to negligence in unloading the cargo, and that the negligence fell within section 1 of the Harter act, and not within section 3, as negligence in the navigation or management of the vessel. Said the court:

"The ship was not under management at the time, but was the inert ground or floor of activities that looked not to her, but to getting the cargo ashore. * * * If the primary purpose is to affect the ballast of the ship, the change is management of the vessel, but if, as in view of the findings we must take to have been the case here, the primary purpose is to get the cargo ashore, the fact that it also affects the trim of the vessel does not make it the less a fault of the class which the first section removes from the operation of the third."

This was said in view of the language of the third section which relieves the owner, charterer, or master of responsibility for damage or loss resulting from errors in navigation or in the management of the vessel.

We agree with the court below that the evidence is insufficient to show that the contracting parties understood that the deck load was to be carried at the shipper's risk, although it was the general custom for steamers like the Wellesley to carry shingles on deck on coast-wise trips, as was well known by both parties to the contract. The shipping contract is shown by a letter of October 22, 1908, written to the president of the appellant by the vice president of the appellee, which confirmed a prior verbal agreement, in these words:

"We hereby confirm our arrangement with you for freighting about 5,000,-000 shingles from Humboldt Bay south on next trip of either the steamer Wellesley or Bowdoin, at the following rate," etc.

The bills of lading were in the following form:

"Received from N. W. P. R. R. Co. for Pacific Redwood Shingle Co. in good order on board the S. S. Wellesley, the following packages, contents unknown, to be delivered to Mr. C. A. Hooper at San Pedro, dangers of fire or navigation or any other accident or danger of the seas, rivers or stream navigation excepted, and with privilege of reshipping on steamboats or barges."

The evidence upon which the appellant relies to prove its construction of the agreement consists in the testimony of the manager of the appellee, who was called as a witness for the appellant. He admitted that the Pacific Coast Shipowners' Association, of which both the appellant and the appellee were members, had adopted a form of contract for the carriage of lumber which contained among other provisions the following:

"Vessel to be permitted to carry her usual deck load, but at shipper's risk."

It is contended that his testimony admits, further, that this contract so adopted formed part of the contract for carriage of the cargo in the present case. But a consideration of the whole of his testimony leaves

it doubtful whether he intended to make any such admission, and, at all events, it makes it clear that whenever the form of contract of the association was adopted, as the witness testified it usually was in charter parties, it was not understood to be an agreement to relieve the carrier from responsibility for bad stowage or willful loss or damage to the cargo by captain or crew. In short, according to the understanding of the witness, the form of contract so framed by the association amounted to no more than this: That in agreeing that goods be stowed on deck at shipper's risk the shipper relieves the ship of responsibility for damage or loss occurring through natural causes where all reasonable care is taken of the cargo during the voyage, an exemption which is not prohibited by the first section of the Harter Act.

We find no merit in the contention that the court made an error in calculating the number of shingles lost or in awarding damages at 7 per cent. per annum compounded at the date of the decree. Seven per cent. was allowed as the legal rate of interest fixed by the law of California, but the appellant contends that it was error to allow more than 6 per cent., the prevailing rate of interest in admiralty causes. It is true that the seventy-first admiralty rule of the court below fixes 6 per cent. as the rate of interest on a judgment entered on a bond or stipulation filed with the clerk for the appraised or agreed value of any property libeled in that court, but that rule has no application to a judgment rendered for a breach of contract to carry goods. The appellant also cites the cases of The Steamship Aleppo, 7 Ben. 120, Fed. Cas. No. 158, and Dyer v. National Steam Navigation Co., 14 Blatchf. 483, Fed. Cas. No. 4,225, collision cases in which Judge Blatchford allowed interest at 6 per cent., for the reason that that rate had been fixed at an early day, in analogy, as the court suggested, to the rate fixed by act of Congress on bonds for duties to the United States, and the court observed that in admiralty, in cases of collision where interest is allowed, it ought to be a uniform rate, and not varying with the laws of the states. But the question has been decided in this court in Northern Commercial Co. v. Lindblom, 162 Fed. 250, 89 C. C. A. 230, where interest was allowed at 8 per cent., the legal rate in Alaska. See, also, The Nith (D. C.) 36 Fed. 86; The Berengere (D. C.) 155 Fed. 439; The Mary N. Bourke, 145 Fed. 909, 76 C. C. A. 441. Nor was it error to award interest upon the whole of the decree from the date thereof. The Blenheim (C. C.) 18 Fed. 47; The Umbria, 59 Fed. 475, 8 C. C. A. 181; The Wanata, 95 U. S. 600, 613, 24 L. Ed. 461.

There was received in evidence a contract between the Switzerland Marine Insurance Company and the appellee, in which it was recited that, while the insurance company doubted its own liability upon the policy, it had, for business and other reasons, consented to pay the same, in consideration whereof the appellee agreed to sue the appellant at the expense of the insurance company, and to pay that company the amount recovered. The present suit having been brought under that agreement, the appellant contends that the appellee is not entitled to recover, for the reasons that it has been paid unconditionally the full amount of its loss by the insurance company, and has no interest in the cause of suit, that there is no right of subrogation because there

was no right of recovery under the contract of insurance, and that the right to recover against the appellant has not been assigned to the insurance company. To this it is to be said that while an insurance company which pays a policy under the circumstances disclosed in this case would have a right of subrogation, and the right to sue the carrier in its own name, it is also well settled that in such a case the insured may sue the carrier for the benefit of the insurer even after the policy has been paid. In Hall & Long v. Railroad Companies, 13 Wall. 367, 20 L. Ed. 594, it was said:

"It is too well settled by the authorities to admit of question that, as between a common carrier of goods and an underwriter upon them, the liability to the owner for their loss or destruction is primarily upon the carrier, while the liability of the insurer is only secondary. * * * Hence it has often been ruled that an insurer who has paid a loss may use the name of the assured in an action to obtain redress from the carrier whose failure of duty caused the loss. It is conceded that this doctrine prevails in cases of marine insurance."

In Pacific Coast S. S. Co. v. Bancroft Whitney Co., 94 Fed. 180, 36 C. C. A. 135, a case in which the insurer, after paying the loss, sued in the name of the insured, Judge Hawley said, after referring to the case last cited and other cases:

"In the face of these authorities it is apparent that the question as to who shall bring the suit is one to be determined between the shippers and the insurance company. It is no concern of the appellant whether the libel is brought in the name of the shippers or in the name of the insurance company. In either event, the right of the claimant in its defense would be identical."

Nor does the fact that the insurance company, notwithstanding its contention that it was not liable, paid the loss to its policy holder, prevent recovery in the present suit. Insurance Co. v. The C. D. Jr., 1 Woods, 72, Fed. Cas. No. 7,051; Sun Mut. Ins. Co. v. Mississippi Valley Transp. Co. (C. C.) 17 Fed. 919; In re Harris, 57 Fed. 243, 6 C. C. A. 320; Nord Deutscher Lloyd v. President, etc., of Ins. Co. of N. A. 110 Fed. 420, 49 C. C. A. 1; Bradley v. Lehigh Valley R. Co., 153 Fed. 350, 82 C. C. A. 426.

The decree is affirmed.