## NORTHERN COMMERCIAL CO. v. LINDBLOM.

(Circuit Court of Appeals, Ninth Circuit. May 4, 1908.)

No. 1,483.

1. **SHIPPING—LOSS OF GOODS—OWNERSHIP—RIGHT TO SUE.**

Where plaintiff, having a grub-staking contract with certain miners, providing for the delivery of outfits to them at an Alaskan port in consideration of one-half of the profits of the mining venture, and pursuant thereto purchased and shipped the outfits by defendant's steamer, which was lost, so that the outfits were never delivered at destination, plaintiff was still the owner, and was therefore entitled to sue for the damages sustained.

2. **SAME—TRUSTEE OF EXPRESS TRUST.**

Plaintiff was still entitled to sue as the trustee of an express trust, even if the title to the outfits passed to the firm, consisting of himself and the persons to whom the outfits were to be delivered, and should be regarded as the owner of the goods from the time they were delivered to the steamship for transportation.

3. **SAME—EVIDENCE.**

In an action against the owners of a vessel for loss of freight, evidence *held* sufficient to go to the jury in support of plaintiff's claim that he entered into the contract of affreightment with defendant, paid the freight, and was the owner and consignor of the merchandise.

4. **SAME—NEGLIGENCE.**

In an action against the owners of a vessel for loss of goods, an allegation that the vessel was wrecked and the merchandise lost on account of defendant's negligence, and without fault on plaintiff's part, raised the issue of defendant's negligence, and authorized the admission of evidence that the vessel was being operated without a full complement of officers, required by Rev. St. § 4463 (U. S. Comp. St. 1901, p. 3045).

5. **SAME—DUTY TO PROVIDE OFFICERS.**

Rev. St. § 4463 (U. S. Comp. St. 1901, p. 3045), declares that no steamer carrying passengers shall depart from any port unless she shall have in her service a full complement of licensed officers and full crew sufficient at all times to manage the vessel, etc. *Held*, that not only must the vessel have a full complement of licensed officers and adequate crew with reference to all the exigencies of the intended route under such section, but the officers and crew must be competent for any exigency that is likely to happen.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 451.]

6. **SAME—DAMAGES.**

In an action against a vessel for loss of miners' outfits destined to a place on the coast of Alaska, where there was no market in which such goods could be bought, the goods being intended for consumption, and not

for sale, the measure of damages was the market value of the goods lost at the place of destination at the time when they should have been delivered, which the jury was authorized to ascertain by taking the price at the place of shipment and adding thereto the cost of carriage and interest at the legal rate.

In Error to the District Court of the United States for the District of Alaska.

This was an action brought by the defendant in error, who was plaintiff in the court below, against the plaintiff in error, defendant in the court below, to recover the sum of $5,297.10 for a breach of contract to carry from Nome, Alaska, and deliver at Point Blossom, Alaska, four passengers and certain merchandise.

The Northern Commercial Company was a common carrier and the owner of the steamship Saidie, and the passengers and merchandise were to be carried by this vessel. It is alleged in the complaint that the defendant was a common carrier for hire, and that the passengers and freight were delivered to the defendant for transportation from Nome to Point Blossom in pursuance of the contract; but the defendant negligently, and without fault on the part of the plaintiff, utterly failed to transport and carry such freight and passengers, or either of them, to the point of destination. In the defendant's answer, it admits that it was a common carrier of passengers and freight for hire between Nome and Point Blossom, both in Alaska, but denies all the other allegations of the complaint.

Upon the trial of the case the plaintiff, Lindblom, testified, among other things, that in September, 1904, he shipped from Nome to Point Blossom on the steamship Saidie certain passengers and freight; that he paid to the agent of the defendant in the office of John J. Sesnon Company about $297 for freight and passenger money. The freight consisted of provisions, mining tools, machinery, and outfit for nine men for one year. The cost of the outfit was $5,203. It was lost on the sea, and he never got any of it back. The passengers were not carried to Point Blossom. The freight shipped was marked ⟨3⟩, which meant Lucky Three Mining Company. Witness said the Lucky Three Mining Company was himself, and they worked under his contract. He paid for the goods and owned them. He paid the passenger money of some of the passengers and some paid their own fare. He paid for two or three. He says, further, that the bills from the merchants amount to $5,300. That was the amount that was on his memorandum that was shipped on the Saidie. The stuff that he bought was used in mining the company's claims on the Kobuk river. The people interested with him in this company were his brother, Classel, Freey, Hansen, and Dahl. The witness had a half interest in the company, and the others owned the other half, and they were all working together. Witness was furnishing the provisions, tools, and money, and they furnished the labor. The profits were divided half and half. This arrangement had been running since 1902 and had not terminated. There were no profits in the year 1904. Some gold dust was taken out, but there was a loss. He bore his part of it, and they lost their labor. The stuff shipped was for the company. The Lucky Three Mining Company was not a corporation. It was a partnership of which witness was a member. When the goods were on the Saidie, they belonged to the company. He was the one that put up the money. The witness finished his testimony, and was afterward recalled, and testified that there were some other persons interested with him in the Lucky Three Mining Company, but that they had no interest in the freight aboard the Saidie. It belonged to the witness until it was turned over to the men in the Kobuk. The men in the Kobuk were "grub-staked" by him. He furnished the provisions. The company had no interest in the provisions before receiving them. There were no more provisions for them to work with, and witness was to furnish the provisions, and they do the work. The proceeds were to be divided half and half, after paying all expenses. Witness was to furnish provisions and machinery, and they were to furnish the labor. After the provisions were lost, witness duplicated the order and sent another outfit on the Corwin.

On cross-examination, the witness testified that he had talked to Mr. Fink (his attorney) at noon about testifying as to who owned the freight and understood now that it was necessary for witness to own these goods, and witness had a talk with Mr. Fink after he got off the witness stand. Mr. Fink did not say it was necessary for witness to say that he owned the provisions, instead of the Lucky Three Mining Company, or anything to that effect. Mr. Fink asked him whether the Lucky Three owned it or the witness. Witness said he owned it; "my own until it gets to its destination." Witness did not understand that he was to be recalled. Witness said that he had bought the goods in the name of the Lucky Three Mining Company; bought for them— for the Lucky Three Mining Company— and he charged them up to the Lucky Three Mining Company. This is true of every article purchased. The Lucky Three Mining Company was a partnership. He had a half interest in the partnership and furnished all the provisions.

On redirect examination he was asked: "Q. Under your contract with these people, and with your partners, Mr. James Lindblom, Classel, and others, were they to have any interest whatsoever in goods and supplies furnished by you prior to the time of their delivery to them? A. No, sir."

The testimony of other witnesses was to the effect that the Saidie ran on the rocks and was lost. She struck on a well-known reef at 3:30 in the afternoon; the weather being fine, and the sea like a mill pond. The vessel had but one mate. The certificate of inspection of the vessel issued by the United States inspector for the district of Juneau, Alaska, on the 9th day of September, 1903, required the vessel to carry two mates. When the vessel struck, neither the master nor mate was on deck. The vessel was in charge of a watchman.

The testimony on behalf of the plaintiff being concluded, counsel for the defendant moved the court to instruct the jury to find a verdict for the defendant, upon the grounds: First. It appeared from the testimony that the ownership of the goods at the time they were placed on board the steamer Saidie was in the Lucky Three Mining Company, a partnership. Second. The plaintiff failed to show that said defendant failed to deliver said goods according to the contract of affreightment. The court overruled the motion. No evidence was offered on behalf of the defendant. The court instructed the jury, and thereafter the jury returned a verdict for the plaintiff in the sum of $5,619.24.

Joseph K. Wood and T. M. Clowes (William Thomas, of counsel), for plaintiff in error.

Albert Fink, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). The defendant contends that the motion to instruct the jury to find a verdict for the defendant should have been granted, upon the ground that the ownership of the goods at the time they were placed on the steamer Saidie was in the Lucky Three Mining Company, a partnership. It is true that the plaintiff in the course of his testimony did say that, "When the goods were on the Saidie, they belonged to the company"; · but he also stated the facts concerning his purchase and shipment of the goods to the Lucky Three Mining Company, from which it appeared that the company was not the owner of the goods on the Saidie, but that the plaintiff was. The plaintiff in his testimony said that the company was a partnership; that the parties interested with him in the company were his brother, Classel, Freey, Hansen, and Dahl. The plaintiff had a half interest in the company, and the others owned the other half, and they were all working together. He furnished the provisions, tools, and money, and they furnished the labor, and the profits were divided half and half. When

there was a loss, plaintiff bore his part of it, and his partners lost their labor. This is an agreement common to mining partnerships in the West, but it is something more than a "grub-staking" contract. Lindley on Mines, vol. 2, § 858. The plaintiff used this term in his testimony. He said "The men in the Kobuk were 'grub-staked' by me. I furnished the provisions. The company had no interest in the provisions before receiving it." The plaintiff made the contract with the defendant for the transportation of the provisions, tools, and other merchandise to the mine and paid the freight on the same. In other words, he delivered the "grub-stake" at the mine where his associates furnished their labor, and the plaintiff was the owner of the "grub-stake" until so delivered. The merchandise was lost. The plaintiff is the only one who has suffered a loss under that contract, and the only one who makes a claim for that loss. He is the real party in interest. This is a fair and reasonable inference from the facts stated, and justified the court in overruling the motion of the defendant to instruct the jury to find for the defendant.

But, assuming that plaintiff's ownership of the goods terminated when they were delivered to the defendant on board the Saidie at Nome for shipment to the Lucky Three Mining Company at Point Blossom, and that on board the Saidie they belonged to the partnership, the defendant would be in no better position, for the plaintiff would still be entitled to maintain this action as the consignor, who made the contract with the defendant as carrier; the plaintiff having thereby constituted himself the trustee of an express trust. In Carter v. Southern Ry. Co., 111 Ga. 38, 36 S. E. 308, 50 L. R. A. 354, Carter sued the railroad company for damages resulting from the breach of a contract of shipment which the defendant had entered into with the plaintiff. Upon the trial the plaintiff testified concerning the shipment and the damaged condition of the goods upon delivery, but just before leaving the witness stand the plaintiff stated:

"The goods belonged to my wife, Mary Carter. She owned them, and I had the goods in my charge as her agent."

There being no further evidence from the plaintiff, the court, on motion of defendant's counsel, granted a nonsuit, on the ground that the goods alleged to have been damaged did not belong to the plaintiff, but to his wife. The case went to the Supreme Court on a writ of error, where leading cases upon this question in England and the United States are reviewed, and the conclusion reached was that the plaintiff was entitled to recover as the consignor. The court says:

"The courts of both this country and England are now, with a few exceptions, all agreed that, where the consignor makes the contract of shipment with the carrier, he may bring an action for loss of or injury to the consignment, although he may not be the actual owner of the property. In such a case the privity of contract between the carrier and the consignor is a sufficient foundation on which to base the action. It is also well settled by the authorities that where a consignor, who is himself not the real owner, recovers damages from the carrier for a breach of the contract of carriage, the recovery inures to the benefit of the owner, and the consignor is regarded simply as the trustee of an express trust."

The rule here stated is abundantly supported by the authorities cited, and, if we apply the rule to the facts of this case, it establishes the plaintiff's right of action as the trustee of an express trust.

We do not overlook the fact that the bills of lading introduced in evidence were issued by the defendant to the parties who sold the merchandise to the plaintiff; but the plaintiff testified that he paid for the merchandise, and that in September, 1904, he paid the freight and passenger money at the office of the defendant's agent, and the only receipt in the record for the freight on the Saidie is one dated September 4, 1904, and this receipt was issued to the plaintiff. This evidence was sufficient to go to the jury in support of plaintiff's claim that he entered into the contract of affreightment with the defendant, and that he paid the freight, and that he was the owner and the consignor of the merchandise.

The defendant objects to certain evidence and instructions of the court to the jury, relating to the negligence of the defendant in having but one mate on board the vessel, whereby the vessel was wrecked and the merchandise was lost, on the ground that the pleadings raised no issue as to any negligence on the part of the defendant operating the Saidie. In paragraph 4 of the complaint, it was distinctly charged that the "defendant negligently, and without fault upon the part of the plaintiff, utterly failed to transport and carry said passengers and freight, or either of them, to said point of destination." This allegation was denied in defendant's answer. The question of negligence was therefore placed in issue by the pleadings, and the evidence was relevant and material to the issue. It is true the plaintiff might have alleged the failure of the defendant to deliver the goods in accordance with the terms of the contract, and left the burden with the defendant to show that the failure was not by reason of any negligence on its part; but the plaintiff having charged the defendant with negligence as the cause of its failure to deliver the goods, and the allegation having been denied, it was relevant and material for the plaintiff to show that the vessel did not have in her service a full complement of officers as required by section 4463 of the Revised Statutes (U. S. Comp. St. 1901, p. 3045). It is the duty of the owners of a steam vessel carrying goods and merchandise, not only to provide a seaworthy vessel, but they must provide a full complement of licensed officers and a crew adequate in number and competent for their duty with reference to all the exigencies of the intended route. The officers and crew must not only be competent for the ordinary duties of an uneventful voyage, but for any exigency that is likely to happen, such, for example, as the striking of a ship on a reef of rocks. Section 4463, Rev. St.; In re Pacific Mail S. S. Co., 130 Fed. 76, 64 C. C. A. 410, 69 L. R. A. 71, citing In re Meyer (D. C.) 74 Fed. 881; Lord v. Goodall Steamship Co., 4 Sawy. 292, Fed. Cas. No. 8,506. The certificate of inspection of the vessel issued by the United States inspector required the vessel to carry two mates. The evidence was that it carried but one. The question of negligence was properly submitted to the jury by the court.

The defendant also objects to the instructions of the court with respect to the measure of damages. The court instructed the jury upon the question as follows:

"These damages will embrace two items: First, the amount, if any, of freight or passenger fare prepaid on any goods and passengers you find were sent, together with interest at 8 per cent. on such sum from the time demand was made on said defendant for such sum to date. Second, the market value of such goods as you find were sent at the place of destination, Blossom, that is, such a sum as the plaintiff could have replaced the goods for at that point, together with interest at 8 per cent. on said sum from the time of demand on the defendant therefor to date."

The objection is made to this charge that it does not correctly state the proper measure of damages. The instruction of the court was correct as applied to the facts in this case. The measure of damages is the market value of the goods lost at the place of destination at the date when they should have been delivered, with interest from that time. The Nith (D. C.) 36 Fed. 86, 96; Ringgold v. Haven, 1 Cal. 108, 118; Prettyman v. Railway Co., 13 Or. 341, 343, 10 Pac. 634; The Arctic Bird (D. C.) 109 Fed. 167, 175; Mobile & Montgomery R. Co. v. Jurey, 111 U. S. 584, 596, 4 Sup. Ct. 566, 28 L. Ed. 527; 3 Hutchinson on Carriers (3d Ed.) § 1360; 3 Sutherland on Damages (3d Ed.) par. 918. But manifestly, if there is no market at the place of destination, which would presumably be the case in a mining camp on the shore of the Arctic Ocean, the jury might consider any other competent evidence tending to prove value at that point. The court accordingly instructed the jury that the market value of the goods at the place of destination was such a sum as would have enabled the plaintiff to replace the goods at that point. This was a reasonable and practical method of ascertaining market value in this case, and hence we find authority for the rule that, if there be no market value for the goods at the place of destination, the jury may ascertain their price by taking the price at the place of shipment, adding thereto the cost of carriage, and allowing, in addition, a reasonable sum for the importer's profit. 3 Sutherland on Damages (3d Ed.) par. 933. In this case the plaintiff did not ship the goods to Point Blossom with the view of realizing a profit on their sale. They were shipped for the purpose of being used by the consignee in mining operations. Under such circumstances, the court properly directed the jury to allow interest, instead of profits. The legal rate of interest in Alaska is 8 per cent. per annum. Section 255, Civ. Code Alaska. The instruction of the court as to the measure of damages was therefore correct.

Finding no error in the record, the judgment of the District Court is affirmed.