**VICK et al. v. HENRY FORD & SON et al.**

(Circuit Court of Appeals, Ninth Circuit. March 7, 1927.)

No. 5018.

1. **Principal and agent** ⚖➡89(8)—Evidence held insufficient to establish contract on which recovery was sought for moneys expended and services performed before termination.

In action to recover moneys expended and reasonable value of services performed prior to termination of oral contract for establishment of agency for farm tractors, evidence *held* insufficient to establish contract.

2. **Contracts** ⚖➡1—"Contract" is agreement creating obligation requiring competent parties, subject-matter, consideration, and mutuality of agreement and of obligations.

A "contract" is an agreement creating an obligation, and requires competent parties, subject-matter, legal consideration, mutuality of

agreement, mutuality of obligation, and agreement must not be in vague or uncertain terms.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contract.]

In Error to the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Action by George Vick and others, partners doing business as Vick Bros., against Henry Ford & Son and another. From an involuntary judgment of nonsuit, plaintiffs bring error. Affirmed.

Walter C. Winslow, of Salem, Or., and Roy F. Shields, of Portland, Or., for plaintiffs in error.

Clifford B. Longley, of Detroit, Mich., and Hugh Montgomery, Everett A. Johnson, and Albert B. Ridgway, all of Portland, Or., for defendants in error.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

RUDKIN, Circuit Judge. This is a writ of error to review a judgment of involuntary nonsuit. For convenience the parties will be designated here as in the court below.

For some years prior to 1918 the plaintiffs had been extensive dealers in Ford automobiles in the state of Oregon, with retail agencies at Salem and Eugene. In June of that year the plaintiff George Vick visited Dearborn, Mich., with a view of obtaining from the defendant Ford & Son a distributing agency for the state of Oregon for farm tractors, commonly called Fordsons. As a result of this visit Ford & Son addressed a letter to the plaintiff George Vick, under date of June 27, 1918, wherein it offered to ship 1,000 Fordson tractors to the plaintiffs for distribution in Oregon at a price of $750 f. o. b. Dearborn, collectible by drafts attached to order bills of lading. The letter further stated that the plaintiffs agreed to accept these tractors during the year beginning July 1, 1918, and to furnish shipping instructions in carload lots of 4 or 7 tractors each. "It is understood that the above arrangements may be canceled at any time, with or without cause, by notice to either party by registered mail." By a second letter bearing date September 6, 1919, a second allotment of 1,500 tractors for the ensuing year was made in monthly allotments of 125 tractors. On September 23, 1919, Ford & Son notified the plaintiffs that from and after July 31, 1920, the farm tractors would be handled and distributed through the Ford Motor Company, and that the distributing contract with the plaintiffs

was canceled as of the latter date. March 17, 1920, the plaintiffs addressed a letter to their own distributing agencies, canceling their contracts with them as of April 1, 1920, and on March 22, 1920, the Ford Motor Company changed the date of cancellation of the distributing contract with plaintiffs from July 31, 1920, to April 1, 1920, at the request of the latter.

So far as the record discloses, there was no breach of the contracts or agreements contained in the letters of June 27, 1918, and September 6, 1919, and no complaint is now made of any such breach. In 1924, the plaintiffs commenced the present action against the defendants for the breach of an oral contract entered into between the plaintiffs and the defendant Ford & Son on the visit of the plaintiff George Vick to Dearborn, Mich., in 1918, claiming damages for such breach. A demurrer to the original complaint was sustained by the court below upon the ground that the contract was void by reason of the statute of frauds. The plaintiffs abided by this ruling and filed an amended complaint, wherein they sought to recover moneys paid out and expended, and the reasonable value of services performed under the oral contract prior to its termination. At the close of the testimony on the part of the plaintiffs the court below directed a judgment of nonsuit upon two grounds: First, because there was no oral contract between the parties as alleged in the amended complaint; and, second, because the several amounts claimed by the plaintiffs were not for moneys paid out or for services performed under an oral contract, within the meaning of the rule of law upon which the plaintiffs based their right of recovery.

The testimony relied on to establish the oral contract was substantially as follows: When the plaintiff George Vick visited the factory at Dearborn, in 1918, as already stated, he met one Sorenson, the manager of the tractor department of Ford & Son. Sorenson introduced him to Henry Ford, saying that the witness had come across the continent from Oregon to get a contract for the distribution of farm tractors in that state, and Ford replied, "I guess we will have to give it to him." Witness then told Sorenson that they could handle the proposition, and Sorenson asked what money they could raise by borrowing. To this the witness replied, "$300,000." The witness told Sorenson that he felt that they could sell 1,000 tractors in the state of Oregon during the first year. Sorenson replied that it was not as easy as it looked; that he wanted the witness to think the proposition over and to spend a day at the plant and meet the officers of the company. Witness did so, and met Sorenson on the following day by appointment. He was then asked what he thought of the proposition, and witness replied that he had already done his thinking, and was ready to do business if they could agree upon a contract. Sorenson replied that there were quite a few things that they wanted to go into definitely; that it would take time; that he wanted to go into it thoroughly, as it was a big proposition. He said that Ford & Son did business differently from any one else, in that it would make no written contracts, but relied entirely upon oral contracts. He further stated that the distribution system would be permanent; that the biggest mistake Henry Ford ever made was in the establishment of branch houses for the distribution of Ford cars; that Sorenson assured the witness that the proposition or problem was a big one, and a serious one; that it was not as easy as it looked; that it was a pioneering proposition; that no money could be made at first, but that lots of money could be made on a business proposition of 10 years; that the latter part of the 10-year period would pay well for the hard work at the start. Witness was then asked whether it was stated that they could have the relationship for 10 years, and answered somewhat evasively: "He just referred to the part we had covered, saying the system of distribution was permanent, and we were permanent features with them, as long as we measured up; that was in each individual case; if we didn't—led me to believe if we fell down—" The witness further testified that the question of territory was discussed; that they were to have the Oregon territory; that Fordson tractors were unknown in Oregon at that time, except through advertisements; that you could not buy the tractors from any other concern than Ford & Son; that the question of price was discussed; that the price at the start was to be $750 f. o. b. Dearborn; that the price was subject to change at any time, and that Ford & Son fixed, not only the price to the distributing agency, but the price at which the tractors should be sold to the farmers; that the plaintiffs would probably receive no tractors prior to August, 1918; that the system of distribution was discussed; that the plaintiffs would have to put dealers in each town where there was a Ford dealer; that, generally speaking, the Ford dealers should be given the preference; that they discussed 1,000 tractors for the first year, but that the number of tractors to be furnished or delivered in the second and

succeeding years was neither mentioned nor agreed upon. The remainder of his testimony related to matters not here involved.

[1, 2] We find in the foregoing testimony not even the semblance of a binding contract. A contract is an agreement creating an obligation. There must be competent parties; a subject-matter; a legal consideration; mutuality of agreement; mutuality of obligation; and the agreement must not be so vague or uncertain that its terms are not ascertainable. The so-called contract in question is lacking in several of these requirements. The subject-matter of the contract was farm tractors, but the number or quantity and the price was neither agreed upon nor ascertainable. The defendant Ford & Son did not agree to manufacture or sell tractors to the plaintiffs in any number or at any price, and assumed no obligation whatever in that regard. When we turn to the plaintiffs' side of the case, we are confronted with the same difficulty. They did not agree to purchase or pay for any number of tractors, and they assumed no obligation in that regard. There was some general discussion as to the necessity for establishing agencies to distribute the tractors, but the plaintiffs assumed no obligation and made no promises. In fine, nothing occurred between the parties beyond a general discussion of farm tractors and the mode of distribution, beginning nowhere and ending nowhere. We have no reference now to the two letters, concerning which no complaint is made. If the parties to this controversy had separated and gone their several ways after parting at the factory, no one would contend that either had any right of action against the other by reason of anything that transpired there, regardless of any question of the statute of frauds. The subsequent conduct of the parties was entirely consistent with this view and utterly inconsistent with any other.

The plaintiff Vick testified that the first letter was received by them some time after his return from Michigan, and this probably must be accepted as a fact, although the record indicates the contrary. The witness left Portland on June 23, and spent two days, or a part of two days, at the factory, so that, if the date of the letter is correct, it must have been written while he was at the factory on June 27, or four days after he left Portland. But, whether this be true or not, the letter was written practically contemporaneous with the so-called oral agreement, and is utterly inconsistent with it, and the subsequent conduct of the parties is equally so. In later correspondence, reference is several times made to the conversation at the factory. What transpired there was never dignified by any other name. No protest was made when the first letter was received, and no protest was made when the letter of cancellation followed, a little over a year later. The plaintiffs expressed some disappointment, or, to use their own words, were hard hit; but there was no suggestion that Ford & Son had not acted within their rights in canceling the distributing contract, and no suggestion that by so doing the terms of any contract, oral or written, had been breached. In fact, so far as the record discloses, there was no suggestion of an oral contract, or the breach of an oral contract, until upwards of six years after its supposed date, nor until nearly five years after its cancellation. Under such circumstances the court below was fully justified in refusing to submit to the jury the question whether such a contract was entered into or existed, and if there was no such contract there was no legal basis for the recovery sought.

The judgment is affirmed.