## H. LIEBES & CO. v. KLENGENBERG.*

Circuit Court of Appeals, Ninth Circuit. January 9, 1928.

No. 5200.

**1. Contracts ⬅—"Contract" is agreement creating obligation.**

"Contract" is agreement creating obligation, in which there must be competent parties, subject-matter, legal consideration, mutuality of agreement, and mutuality of obligation, and agreement must not be so vague or uncertain that terms are not ascertainable.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contract.]

**2. Shipping ⬅108—Trapper held not entitled to recover for failure to transport furs, in view of uncertainty of contract as to number of skins to be transported.**

Trapper and fur trader *held* not entitled to recover for respondent's failure to transport certain furs to San Francisco, where there was no valid contract for such transportation, in that number of skins to be transported was neither mentioned nor agreed on, and trapper was not required to have respondent transport all his skins.

**3. Shipping ⬅132(5)—Evidence held to support finding that respondent, without legal excuse, breached contract to deliver merchandise to peninsula in Arctic Ocean.**

In libel for failure to deliver merchandise and supplies to peninsula in Arctic Ocean, evidence *held* sufficient to support finding that respondent breached contract to deliver such merchandise without legal excuse, in view of length of time seas were open, notwithstanding injury to ship in ice jam.

**4. Shipping ⬅131—Damages for failure to deliver merchandise to peninsula in Arctic Ocean should be assessed on basis of invoice price at place of shipment, there being no "market value" at time and place of delivery.**

Damages for respondent's breach of contract to deliver merchandise and supplies to trapper at peninsula in Arctic Ocean should be computed on basis of invoice price at point of shipment, with interest, there being no market value at time and place of delivery, since "market value" is price at which goods can be replaced for money in market, not price for which they are sold at retail.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Market Value.]

*Rehearing denied February 6, 1928.

**5. Admiralty ⬅12—Contract for transportation of supplies to Arctic Ocean held maritime, giving admiralty court jurisdiction of libel for breach.**

Contract for transportation of supplies to trapper at point on peninsula in Arctic Ocean *held* maritime, so as to give admiralty court jurisdiction of libel for breach, in view of fact that supplies were purchased and placed on board ship for transportation.

**6. Shipping ⬅113—Trapper held not required to accept delivery of supplies at another point than that designated in contract for transportation.**

Trapper and fur trader, who made contract under which supplies were to be transported to point on peninsula in Arctic Ocean, *held* under no obligation to accept delivery of part of supplies at another point.

**7. Shipping ⬅131—Interest established by local law applies in determining damages for failure to transport goods.**

Courts of admiralty will apply rate of interest established by local law in determining damages for failure to transport goods.

Appeal from the District Court of the United States for the Southern Division of the Northern District of California; Frank H. Kerrigan, Judge.

Libel by C. Klengenberg against H. Liebes & Co. From the decree, respondent appeals, and libelant cross-appeals. Reversed and remanded, with directions..

Bell & Simmons and McKinstry, Haber & Firebaugh, and Golden W. Bell, all of San Francisco, Cal., for appellant and cross-appellee.

Glensor, Clewe & Van Dine, of San Francisco, Cal., for appellee and cross-appellant.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

RUDKIN, Circuit Judge. This is an appeal and cross-appeal from a final decree in admiralty. In view of the two appeals, we will refer to the parties as they were designated in the court below.

The libel contains two causes of action: The first for failure on the part of the respondent to deliver certain merchandise and supplies at a point on the Wollaston Peninsula in the Arctic Ocean, about 1,260 miles from the North Pole; and the second for failure on the part of the respondent to transport certain furs from the point on the Wollaston Peninsula to San Francisco. The facts and surrounding circumstances are about as follows:

The libelant has been a trapper and fur trader in the Arctic regions since 1896. For about four years prior to 1920 he was located

on the Coppermine river, but in the latter year he moved his camp to the point now in question on Wollaston Peninsula. Prior to 1919 he traded almost exclusively with the Hudson Bay Company, but in 1919 he traded with Capt. Pederson, representing the respondent, and with others, and in 1920 with Pederson and the Northern Trading Company. For a great many years last past the respondent has been engaged in the fur business at San Francisco. It has maintained a number of trading stations along the Alaska coast, and each spring dispatched one or more vessels from San Francisco, to carry supplies to the different trading stations, to trade for furs between stations, and to bring out the furs thus acquired on the return trip in the fall. The general course pursued by the vessels thus employed was to stop at Point Hope and trade along the coast until the ice broke up, so that the vessels could proceed to Point Barrow. The vessels would then trade east from Point Barrow to Herschel Island; thence to the mouth of the McKenzie river, and thence to Baillie Island, about 300 miles southwest of the Wollaston Peninsula. If the vessels had no business farther east, the crews would then hunt for whales off Baillie Island before starting on the return trip to San Francisco. Prior to 1921 none of the vessels thus employed had proceeded as far east as the camp established by the libelant on the Wollaston Peninsula. Capt. Pederson, above referred to, was in the employ of the respondent as master and trader from 1914 to May, 1923, except during the year 1915, and made eight trips to the Arctic regions, such as we have described.

In the summer of 1921 Pederson picked up upwards of 500 white fox skins belonging to the libelant at Shingle Point and brought them on board his vessel to Baillie Island. At Baillie Island the libelant came on board and was desirous of trading the fox skins for merchandise; but he and Pederson could not agree on a price for the skins. It was finally agreed that Pederson would sell and deliver the merchandise to the libelant and take the fox skins out, to be sold to the highest bidder, but in no event to the respondent, and that the proceeds of the sale would be applied by Pederson in payment of the account due the respondent, the balance to be used to pay the purchase price of certain supplies then ordered by the libelant, which were to be brought in and delivered in the following year, ice conditions permitting, or as soon thereafter as ice conditions would permit. Practically all that was said by ei-

ther party about transporting skins out in the following year was that the libelant told Pederson that, when he brought in the supplies in the following year, he would make it worth his while; that he wanted to save his furs; that he would either sell them to Pederson, or if they could not agree upon a price that Pederson could take them out and handle them as in the other case; that Pederson told him that he would take the furs out under the respondent's insurance policy, charging the libelant $1 per skin for so doing. In the course of the conversation, a list of the supplies to be brought in during the ensuing year was prepared by Pederson, and the list was agreed upon, as well as the time and place of delivery.

[1, 2] There is, therefore, no doubt that there was a valid contract for the transportation and delivery of the supplies at Wollaston Peninsula in 1922, or as soon thereafter as ice conditions would permit; but we think it is equally clear that there was no valid contract for the transportation of furs from the Wollaston Peninsula to San Francisco in 1922, or thereafter.

"A contract is an agreement creating an obligation. There must be competent parties, a subject-matter, a legal consideration, mutuality of agreement, mutuality of obligation, and the agreement must not be so vague or uncertain that its terms are not ascertainable." Vick v. Henry Ford & Son, 17 F.(2d) 919.

The number of skins to be transported was neither mentioned nor agreed upon; nor was there anything in the brief conversation between the parties from which the number could be definitely fixed or ascertained. If it be claimed that the agreement covered all skins that might be purchased or otherwise acquired by the libelant during the long, indefinite period that might elapse between the date of the conversation and the arrival of the vessel at Wollaston Peninsula, it is a sufficient answer to say that the parties did not so agree, and that the conduct of the libelant himself was utterly inconsistent with any such claim, for it is admitted that he sold 100 skins to a third party before the respondent's vessel could possibly have arrived at the peninsula in 1923, and this of itself would constitute a breach of his contract to transport all such skins by the respondent's vessel, if there was in fact any such contract. And if the contract did not include all skins, but only such as the libelant might elect to send out, it was necessarily void for uncertainty.

Again, Pederson, the former agent of the

respondent, arrived at Baillie Island in 1923, before the respondent, and, according to his log, was on the lookout for the libelant for several days to obtain skins from him. Pederson testified that his log was in error in that regard, but admitted that he was on the lookout for him on at least one occasion, and that his purpose was to obtain skins from him. In so doing it is hardly to be presumed that Pederson intended to induce the libelant to breach a contract made with respondent, through himself as agent, some two years before, yet, if there was a contract, such would have been the necessary effect of his act. In any event, we think it clearly appears from the record that the libelant was at all times at liberty to sell or dispose of his furs to Pederson or to any one else, and that, had he done so, he would have breached no contract with the respondent.

Again, the agreement was that the libelant would sell the skins to Pederson if they could agree upon a price, and if not the skins would be handled in the same manner as the skins were handled in 1921. There was no likelihood that a sale would be made or that the parties would agree upon a price, because the libelant himself testified repeatedly that he would have no dealings with the respondent, and furthermore no claim is made that there was any breach of a contract to sell. The testimony shows quite plainly, too, that the agreement of 1921 between the libelant and Pederson in reference to taking out and selling the skins that year was purely a personal one with Pederson, and not an agreement with the respondent at all. Pederson testified that the libelant had asked him if he would take the skins out and sell them *personally* for him, but not to the respondent, and pay the respondent for the merchandise already purchased, and apply the balance on the supplies then ordered for the ensuing year. The testimony of the libelant was to the same effect, and if the respondent had made demand on the libelant at Wollaston Peninsula for a delivery of the skins to be handled as in 1921, the libelant might well have replied that he had made no such agreement.

We are not here concerned with the question whether Pederson, as agent for the respondent, was at liberty to deal on his own account as he did. Whatever his rights might be in that respect, the libelant was at liberty to contract with whom he chose, and repose confidence where he willed, and it is apparent from the testimony that, in so far as sending out the skins in 1921 was concerned, he chose

to contract with Pederson individually, and not with the respondent. Some reference is made to the fact that, when Pederson arrived on the outside, he caused the skins to be shipped to London for sale through the respondent. But, in so doing, Pederson was acting on his own responsibility and adopted that means to carry out his instructions to sell. Had Pederson failed to account for the proceeds of the sale, or had he converted the skins to his own use, we fail to see, under the testimony, how the respondent could be held responsible for his acts. For these reasons, we are clearly of opinion that there can be no recovery on the second cause of action.

[3] Two questions arise under the first cause of action: First, was there a breach of the contract to make delivery? and, second, what is the proper measure of damages? On the first question we do not think that the finding of the court below, that delivery could have been made in 1923, should be disturbed. Briefly stated, the supplies in question were placed on board one of the respondent's vessels at San Francisco in the spring of 1922, and the vessel proceeded north, but was unable to make delivery at Wollaston Peninsula because of ice conditions. This much the libelant concedes. The two knock-down houses, constituting a considerable part of the shipment, were stored at Herschel Island, and the remainder of the supplies were brought back to San Francisco. In the spring of 1923 the supplies, other than those stored at Herschel Island, were again placed on board a different vessel operated by the respondent, in charge of a different master; Pederson having left the service of the respondent in the meantime. Early in May, 1923, the vessel sailed from San Francisco, but while proceeding north was caught in an ice jam off Wainwright on July 25. The ice closed in on the vessel, and she drifted with it from July 25 to August 2. Just before she became fast, a piece of ice passed under her keel, jamming her propeller and bending one of the blades, so that it bit into the rudder post and the engines could not be started. Finally, on August 2, the vessel got clear of the ice and proceeded on her way. Upon arriving at Herschel Island the two knock-down houses stored there the previous year were taken on board, and the vessel proceeded to Baillie Island, arriving there on August 21. She remained at Baillie Island until August 25, and then returned westward, trading on the way, without delivering the supplies at Wollaston Peninsula.

As already stated, Wollaston Peninsula is about 300 miles in a northeasterly direction from Baillie Island. At the customary rate of speed maintained by the vessel, it should have required approximately four days to make the trip from Baillie Island to Wollaston Peninsula and return, and, allowing a brief stay there to discharge her cargo, the entire delay caused by the delivery at Wollaston Peninsula should not have exceeded one week. The testimony shows quite clearly, viewing the situation in retrospect, at least, that she could readily have delivered the freight and returned to San Francisco before the close of navigation. Nor do we think that the master was justified in failing to make the attempt. The extent of the injuries to the vessel were well known to him; they could not be repaired on shipboard, according to his view, and, notwithstanding this, he proceeded away from where repairs could be made from August 2 to August 21, and no repairs were in fact made or deemed necessary until the ship returned to San Francisco, some months later. In view of these circumstances, and in view of the fact that the northern seas were more open in 1923 than for many previous years, the court, we think, was warranted in finding that there was no legal excuse for failure to make the delivery in 1923, as required by the contract of carriage.

[4] It is conceded by both parties that the measure of damages for failure to make delivery in cases of this kind is ordinarily the market value of the goods at the time and place of delivery, with interest. On the first reference, the commissioner found that the supplies in question had no market value at the time and place of delivery, and he therefore assessed the damages on the basis of the invoice price at San Francisco, the place of shipment, together with interest thereon. It appears that this report was not satisfactory to the court, and the case was referred back to the commissioner, with instructions to make a further report on the question of market value. In his supplementary report, based on the same testimony, the commissioner found that the market value was 250 per cent. of the invoice price. Exceptions to this latter report were overruled, and a decree followed in accordance therewith.

In our opinion, the first report of the commissioner was correct. In attempting to fix the market value, the libelant was interrogated as to the prices at which he sold or traded ammunition to the natives, and thereafter testified generally that the prices were fixed as follows:

"As soon as we enter Canada, we add 50 per cent. to the cost. At Baillie Island, we add another 100 per cent. At Victoria Land, or Tree River, or any eastern point like that, we add another 100 per cent. to that, again."

While not expressly so stated, we presume that the price at which ammunition was sold or traded to the natives was arrived at in this way, because that was the subject-matter concerning which the witness was being interrogated. But the price thus paid by the natives was not the market value at all, and had little or no tendency to establish such value.

"In case of a loss of goods by reason of the failure of a common carrier to transport and deliver them in accordance with his contract, the general rule is that the measure of damages is the market value of the goods at the place of destination, at the time and in the condition they should have been delivered, with interest from the time they should have been delivered, less the amount of freight charges due for their transportation. The market value is the price at which the goods can be replaced for money in the market; not the price for which they are sold at retail."

In Northern Commercial Co. v. Lindblom (C. C. A.) 162 F. 250, the court below instructed the jury that the damages embraced two items, with the first of which we have no present concern. In reference to the second, the court said:

"Second. The market value of such goods as you find were sent at the place of destination, Blossom; that is, such a sum as the plaintiff could have replaced the goods for at that point, together with interest at 8 per cent. on said sum from the time of demand on the defendant therefor to date."

The instruction was approved by this court, and in approving it the court added: "We find authority for the rule that, if there be no market value for the goods at the place of destination, the jury may ascertain their price by taking the price at the place of shipment, adding thereto the cost of carriage, and allowing, in addition, a reasonable sum for the importer's profit." This latter question was not before the court, however, except in a general way. In this case there was not the slightest testimony tending to show the price at which the supplies could be replaced at the time and place of delivery. On the contrary, it was conceded that they could not be replaced at that time and place at all, or at any

price, so that the ordinary rule of damages could not be applied. And, if we should attempt to apply the rule suggested by this court in the Lindblom Case, we are confronted with equal difficulty. A part of the shipment consisted of ammunition, but by far the greater part consisted of supplies intended for use or consumption by the libelant himself. We are not advised as to the original cost of the ammunition and other supplies intended for resale, and the record affords no basis for fixing a reasonable profit on them to the importer. As to the remainder of the supplies not intended for resale, of course, no profits could be allowed. Northern Commercial Co. v. Lindblom, supra. The rule of damages first adopted by the commissioner was, therefore, the only one that would meet the situation confronting him.

[5] A want of jurisdiction is urged by the respondent on the ground that the contracts in suit are not maritime, but we think that at least the contract for the transportation of supplies was maritime, in view of the fact that the supplies were purchased and placed on board ship for transportation. Had Pederson failed to purchase the supplies, or cause them to be purchased, a different and more difficult question would be presented.

[6] Respondent further contends that it was the duty of the libelant to accept the supplies stored at Herschel Island on the second voyage; but he was under no obligation to accept delivery of a part of the supplies at a distant point. Furthermore, it does not appear that he could have done so, even had he so desired.

[7] For the reasons here stated, the second cause of action should be dismissed, and a decree entered on the first cause of action in favor of the libelant for the sum of $5,411.21, the price paid for the supplies and the freight advanced, with interest at the rate of 7 per cent. per annum from the date on which the supplies should have been delivered, which is fixed for convenience as of September 1, 1923. The respondent contends that interest should be computed at the admiralty rate of 6 per cent., instead of at the rate prescribed by the law of the forum; but this court has held otherwise. Rotterdamsche Lloyd v. Gosho Co. (C. C. A.) 298 F. 443.

The respondent will recover its costs on this appeal, and the costs below should be divided on an equitable basis, having in mind the fact that the libelant prevailed as to one cause of action and failed as to the other.

The decree is reversed, and the cause is remanded, with directions to enter a decree in accordance herewith.