AMERICAN BITUMULS Co., peticionaria, *v.* TRIBUNAL DE CONTRIBUCIONES DE PUERTO RICO, demandado; RAFAEL BUSCAGLIA, TESORERO DE PUERTO RICO, interventor.

Núms. 69, 70, 86 y 88.—*Sometidos:* Marzo 18, 1946. *Resueltos:* Julio 1, 1946.

*James R. Beverley* y *Carmen B. Hernández,* abogados de la peticionaria; *Hon. Procurador General E. Campos Del Toro* y *J. B. Fernández Badillo,* abogado éste del Departamento de Justicia, abogados ambos del interventor, Tesorero de Puerto Rico, querellado en el pleito principal.

El Juez Presidente Señor Travieso emitió la opinión del tribunal.

La corporación peticionaria declaró al Tesorero de Puerto Rico que su propiedad mueble sujeta a tasación en enero 15, 1943, ascendía a $21,496.50 y en enero 15 de 1944 a la cantidad de $25,396.70. El Tesorero notificó a la peticionaria que su propiedad mueble había sido tasada en $39,440 para el año 1943–44 y en $65,600 por el año contributivo de 1944–45. No estuvo conforme la peticionaria y radicó sendas querellas ante el Tribunal de Contribuciones, alegando en cada una de ellas que la tasación hecha por el Tesorero es injusta e ilegal por estar basada en una errónea interpretación del concepto "valor en el mercado" y haberse incluído en ella los beneficios futuros de la corporación en la venta de mercancías, sobre los cuales se pagó la contribución sobre ingresos.

Al serle notificada la imposición de la contribución para cada uno de dichos años, la peticionaria pagó la suma con que estuvo conforme y radicó dos nuevas querellas en las que alegó como razones adicionales en contra de la contribución que le fué impuesta, que el Tesorero valoró el asfalto (bitumuls) depositado en el tanque en enero 15 de 1943 y en enero 15 de 1944 tomando como base el valor en el mercado al detal de cada galón, en vez de tomar como base el costo de la mercancía puesta en el almacén de la peticionaria.

El Tribunal de Contribuciones en octubre 19 de 1945 resolvió en ambos casos que las existencias de "bitumuls" y "laykold" de la querellante fueron tasadas por el Tesorero siguiendo un procedimiento razonable y correcto, pero que, en lo que al monto de dichas existencias se refiere, dicho funcionario deberá proceder a tasar, en la forma y a los precios a que lo hizo, la cantidad de 132,990 galones de bitumuls y 8,250 de laykold por el año 1943–44 y la de 252,873 galones de bitumuls y 109 galones de laykold por el año 1944–45 por

ser ésas las cantidades de dichos productos que la contribuyente tenía realmente en existencia en las fechas indicadas.

No estando conforme con las resoluciones del Tribunal, la contribuyente radicó en noviembre 21, 1945, las dos solicitudes de *Certiorari* Núms. 69 y 70. Las consideraremos y resolveremos con una sola opinión por envolver ambas la misma cuestión.

La peticionaria alega, en síntesis, que el Tribunal de Contribuciones erró al resolver que el procedimiento seguido por el Tesorero para tasar la mercancía es razonable y correcto, cuando en realidad no lo es por los siguientes motivos:

(1) Porque al tasar la existencia completa de mercancías no se tomó en cuenta su valor en el mercado productor y sí su valor en el mercado al detal, incluyendo en el mismo futuras ganancias, las cuales son inciertas y eventuales.

(2) Porque "valor en el mercado" es lo que estaría dispuesto a pagar un comprador o sea lo que costó la mercancía puesta en el almacén o sea su valor en el mercado productor; y no su precio de venta al detal, como sostiene el Tesorero, por ser el precio al detal un factor indeterminado, que fluctúa y puede ser afectado por múltiples circunstancias tales como la competencia, la demanda y la introducción de otros productos.

(3) Porque el Tesorero valoró la mercancía en conjunto, dándole un valor como si se vendiese al detal, lo que es contrario a la ley y a las prácticas mercantiles.

(4) Porque al tasar la propiedad dicho funcionario tomó en cuenta futuras ganancias de la peticionaria, imponiendo así a ésta una doble tributación, por estar dichas ganancias sujetas al pago de la contribución sobre ingresos.

En febrero 26 de 1946, el Tesorero solicitó la desestimación de ambos recursos, alegando que esta Corte carece de jurisdicción para conocer de los mismos (*a*) porque no habiéndose radicado un nuevo cómputo ni notificado por el Secretario la finalidad de las resoluciones recurridas, los recursos

han sido interpuestos prematuramente; y (b) por no haberse hecho el pago bajo protesta.

En abril 12 de 1946, la peticionaria radicó dos nuevas solicitudes de certiorari Núms. 86 y 88 en las cuales reprodujo todas las alegaciones de las anteriores y alegó como hechos adicionales que en marzo 11 de 1946 el Tesorero radicó el cómputo de la contribución adeudada; que dicho cómputo fué aprobado y la finalidad de la resolución del Tribunal notificada a la peticionaria el día 14 del mismo mes y año; que el 12 de abril de 1946 la peticionaria pagó bajo protesta el balance adeudado de acuerdo con la decisión; y que estas nuevas solicitudes se radican en vista de lo resuelto por esta Corte Suprema en *Island Needlework Incorporated* v. *Tribunal de Contribuciones,* certiorari Núm. 64, 65 D.P.R. 727, 733.

Aun cuando resolviéramos que los recursos números 69 y 70 fueron radicados prematuramente, siempre tendríamos jurisdicción para conocer de los recursos números 86 y 88 que envuelven la misma cuestión. Procederemos, pues, a considerarla y resolverla en sus méritos.

No existe controversia alguna en cuanto al monto de las existencias sobre las cuales debe pagarse la contribución. El Tribunal de Contribuciones dió entero crédito a la prueba aducida por la querellante y resolvió que las existencias de dichos productos eran en enero 15, 1944, 252,873 galones de bitumuls y 109 galones de laykold. La única cuestión que debemos considerar y resolver es cuál de los dos procedimientos es el razonable y correcto: (a) el seguido por el Tesorero de Puerto Rico, en el cual se tomó como base para la tasación el precio de la mercancía en venta al detal, incluyendo en el mismo las futuras ganancias; o (b) el que sugiere la peticionaria, o sea que la tasación debió ser practicada tomando como base el valor de la mercancía en el mercado productor, *"replacement cost",* más los gastos in-

curridos en la transportación de la mercancía hasta el almacén de la contribuyente.

La disposición aplicable del Código Político de Puerto Rico es la siguiente:

"*Artículo 294.*—La parte de propiedad de cualquier fabricante, comerciante o negociante que consista en existencias de mercancías u otros efectos para la venta, será inscrita aparte y tasada por el promedio de su valor en el mercado durante el año próximo anterior a la fecha de la valuación; y el tasador, al tasar las citadas existencias, podrá exigir a dichos fabricantes, comerciantes o negociantes la exhibición del último inventario de ellas: y si a juicio del tasador ese inventario no fuese correcto, o si hubiese transcurrido tanto tiempo desde que se hizo que haya dejado de ser fidedigno, y si dicho comerciante o negociante dejare de presentar un nuevo inventario dentro del término de diez días, o si el tasador no considerare fidedigno este último inventario, entonces el tasador valuará dichas existencias examinándolas personalmente."

Examinemos la jurisprudencia en que se apoyó el Tribunal de Contribuciones para resolver, como resolvió, que el "valor en el mercado" de la mercancía para los efectos de su tasación es el precio por el cual el dueño o productor de la mercancía la ofrece en venta al detal a quien desee comprarla en el curso ordinario de su negocio.

En *Cliquot* v. *United States,* 70 U. S. 114, 18 L. ed. 118, el Gobierno Federal instituyó un procedimiento para la confiscación de un número de cajas de *champagne* exportadas de Francia e importadas por el puerto de San Francisco. Se alegó en la demanda que el consignatario "había presentado y usado una factura que no contenía una relación fiel y completa del real y verdadero valor en el mercado de dichas mercancías en la fecha y en el sitio cuando y donde las mismas fueron adquiridas o manufacturadas; y que, por el contrario, como muy bien lo sabía dicho dueño, dicha factura era falsa, y el valor en el mercado de la mercancía era mucho mayor que las sumas que aparecían en dicha factura".

El juez que presidió la vista, en sus instrucciones al jurado, definió el "valor en el mercado" de la mercancía, así:

"el precio por el cual el dueño de las mercancías, o el productor, las tienen para la venta; el precio por el cual son ofrecidas libremente en el mercado a todo el mundo; aquellos precios que los traficantes en esos artículos están dispuestos a recibir y que los compradores se ven obligados a pagar, cuando los artículos son vendidos y comprados en el curso ordinario de los negocios."

La Corte Suprema confirmó la sentencia ordenando la confiscación. Posteriormente, en *British & Foreign Marine Insurance Co.* v. *Maldonado & Co., Inc.,* 182 Fed. 744 y en *Muser* v. *Magone,* 155 U. S. 240, 39 L. Ed. 135, se citó con aprobación la instrucción arriba transcrita.

En los casos que acabamos de citar se trataba de la imposición y cobro de derechos de aduana *"ad valorem",* sobre mercancías compradas en mercados extranjeros e importadas a los Estados Unidos. De conformidad con la sección 2906 de los Estatutos Revisados, "cuando un tipo de derechos de aduana *ad valorem* es impuesto sobre mercancía importada . . . el colector . . . hará que se tase el actual valor en el mercado o precio al por mayor de la mercancía, en la fecha de su exportación a los Estados Unidos, en los mercados principales del país de donde la mercancía ha sido importada, y el valor así tasado será considerado como el valor sobre el cual se impondrán los derechos." Tanto en el caso de *Cliquot* como en el de *Muser* v. *Magone,* en el que se trataba de bordados en algodón, los inspectores tomaron como base para la valuación de la mercancía el precio al por mayor pagado en el mercado extranjero en donde fué adquirida por el importador para ser traída a los Estados Unidos. Pero en ninguno de los dos casos se tomó como base para la tasación el precio al detal de la mercancía importada en el mercado consumidor. En realidad la regla aplicada en dichos casos fué la de tomar como base el costo de reposición (*replacement value*) de la mercancía o sea lo que costaría

reponer esa mercancía, comprándola a precio de por mayor en el mercado productor.

Convenimos con el Tribunal recurrido en que la jurisprudencia sentada por la Corte Suprema Federal debe ser seguida por nosotros en cuanto pueda aplicarse, pero no podemos convenir en que los casos que hemos examinado nos obliguen a sostener la resolución recurrida.

Es numerosa la jurisprudencia de las jurisdicciones estatales en la que se sostiene que *"market value"* significa *"replacement cost"* o "el precio por el cual los artículos pueden ser repuestos por dinero en el mercado, y no el precio por el cual son vendidos al detal."[1]   En *Rust-Owen, etc.* v. *Wisconsin Tax Commission*, infra, se resolvió que: *"market* significa el mercado de compra y no el de ventas. Nunca debería ser interpretado como que significa los precios de venta de la entidad a la cual pertenece la mercancía. Tal base para la valuación del inventario resultaría en una anticipación de los beneficios o pérdidas, lo cual es contrario a una buena contabilidad".

Mertens, en su obra *"Law of Federal Income Taxation"*, Vol. 10, Cap. 59.02, pág. 440, dice:

"El valor para los fines contributivos en términos generales se considera ser la cantidad que un vendedor voluntario y un comprador deseoso y capaz de comprar, ambos familiarizados con la situación, razonables en sus puntos de vista, actuando en su propio interés, y cada uno de ellos dispuesto a modificar sus puntos de vista en cuanto al valor en lo que fuere necesario para efectuar una venta por una suma razonable y justa para ambas partes, pagarían y aceptarían."

En *Appeal by Borough of Millbourne*, 198 A. 49, 329 Pa. 321, se dijo:

"El procedimiento correcto para fijar el valor de la propiedad para la imposición de contribuciones por el Borough es determinar su valor real (*actual value*) o sea su valor en el mercado (*market*

[1] *General Fire Extinguisher Co.* v. *Beal-Doyle Dry Goods Co.*, 160 S.W. 889, 892; *Wehle* v. *Haviland*, 69 N.Y. 448; *Rust-Owen, etc.* v. *Wisconsin Tax Commission*, 231 N.W. 870; *H. Liebes & Co.* v. *Klengenberg*, 23 F. 2d 611.

*value*), el cual se define como el precio que un comprador dispuesto pero no obligado a comprar pagaría a un dueño dispuesto pero no obligado a vender, tomando en consideración todos los usos a que la propiedad es adaptable.''

La misma definición puede encontrarse en numerosos otros casos.(²) Pero en ninguno de los casos citados hemos podido encontrar que para la valuación de mercancías a los efectos del pago de la contribución sobre la propiedad mueble se haya tomado como base el precio de la mercancía en venta al detal, como se hizo en el caso de autos.

Opinamos que el procedimiento seguido por el Tesorero, o sea el de tomar como base para la valoración el precio de venta al detal de cada galón de *bitumuls* y de *laykold* depositado en los tanques de la contribuyente el día 15 de enero de cada uno de los años en controversia, es contrario al estatuto pues con ello se obliga al dueño de la mercancía a pagar contribución sobre ganancias aún no realizadas y que tal vez podrían nunca ser realizadas. Si la propiedad depositada en el almacén del contribuyente y aún no vendida en enero 15, fuese destruída por un incendio el 16 de enero, el contribuyente, de acuerdo con el método seguido por el Tesorero estaría obligado a pagar la contribución no solamente sobre el *''replacement value''* de la mercancía si que también sobre las ganancias que hubiese podido realizar y que no pudo realizar por haber sido destruída la mercancía. Ése no es ni pudo ser el propósito del legislador.

Somos de opinión, y así lo resolvemos, que el procedimiento que el legislador tuvo en mente para fijar el valor de las existencias de mercancías u otros efectos para la venta, es el de tomar como base el promedio de su valor en

---

(²)*Kansas City W. & N.W. R. Co. v. Fisher*, 30 P. 111; *Dady v. Condit*, 58 N.E. 900, 902; *Clark v. Commercial Trust Co*, 181 A. 269, 119 N.J. Equity 133; *Madisonville, etc. v. Ross*, 103 S.W. 330; *Underwood Typewriter Co. v. City of Hartford*, 122 A. 91; *Smith v. Louisville & N. R. Co.*, 209 N.W. 465; *Cumberland Pipe Line Co. v. Commonwealth*, 15 S.W. 2d 280; *Philadelphia & Reading Coal Co. v. Commissioners*, 186 A. 105. Véase: ''The Valuation of Property'', by James C. Bonbright, págs. 291 y 506.

el mercado, o sea el costo de reposición o reproducción para el traficante, durante el año próximo anterior a la fecha de la valuación.

*La resolución recurrida debe ser anulada y el caso devuelto al Tribunal de Contribuciones para ulteriores procedimientos no inconsistentes con esta opinión.*