Concepción Camacho, demandante y apelante, v. Compañía Popular de Transporte, Inc., demandada y apelada.

Núm. 9729.—*Sometido:* Enero 10, 1949. *Resuelto:* Marzo 25, 1949.

*Félix Ochoteco, Jr. y Luis E. Dubón,* abogados del apelante; *R. Arjona Siaca, Artemio P. Rodríguez y Santos P. Amadeo,* abogados de la apelada.

El Juez Asociado Señor Marrero emitió la opinión del tribunal.

La demandada se dedica a la transportación de pasajeros, mediante paga, en lanchas de motor entre San Juan y Cataño. El día 22 de agosto de 1942, a las 9:45 a.m., la lancha número 5 de la demandada salió de Cataño hacia San Juan en uno de sus viajes regulares, siendo desmantelada su parte superior por una ráfaga que lanzó al mar la capota que cubría su segundo piso, un número de salvavidas y algunos de los bancos en que acostumbraban sentarse los pasajeros. La violencia del viento también lanzó a la bahía al menor Angel David Camacho, quien iba como pasajero y quien como resultado del accidente pereció ahogado. Concepción Camacho, en su carácter de padre del menor, instó demanda de daños y perjuicios por la muerte de éste y luego de un juicio en sus méritos, en el cual las partes adujeron abundante prueba testifical y documental, la corte inferior dictó sentencia declarando sin lugar la demanda, con costas al demandante. En su relación de hechos y opinión declaró probados, entre otros, los siguientes extremos:

"Que al poco tiempo de haber salido la lancha de Cataño hacia San Juan un inesperado remolino, tromba marina, y vientos muy fuertes desprendieron la parte superior de la lancha, cayendo con tal parte superior el niño al agua, en donde pereció ahogado.

"Que el conductor o encargado de la lancha, a pesar del esfuerzo que hiciera para ello, no consiguió encontrar el niño en el sitio en que cayera al agua.

"Que el accidente en donde perdiera su vida el menor Ángel David Camacho debe clasificarse como un accidente desgraciado en donde no medió culpa o negligencia alguna por parte de la demandada."

De la sentencia así dictada apeló el demandante y sostiene ahora que el tribunal inferior erró al resolver que en

el accidente en donde perdió la vida el menor Angel David Camacho no medió culpa o negligencia alguna de parte de la demandada; al dictar sentencia declarando sin lugar la demanda y al no haber declarado ésta con lugar, con costas y honorarios de abogado.

El apelante discute conjuntamente los errores por él señalados y al iniciar su alegato admite que la citada turbonada por ser un acto de Dios o de la naturaleza estaba fuera del alcance de la apelada, pero sostiene que no obstante lo admitido, en la muerte del menor intervino culpa y negligencia por parte de la apelada.

Los errores señalados y la forma en que éstos son discutidos nos obligan a hacer una reseña de la prueba aducida por las partes. La del demandante tendió a demostrar que en la fecha y a la hora indicadas el menor Angel David Camacho, quien a la sazón tenía poco más de trece años de edad y cursaba el séptimo grado de escuela elemental, después de pagar por su pasaje abordó la lancha número 5 de la demandada con el propósito de trasladarse a San Juan en busca de un libro que necesitaba para sus estudios; que ocupó un asiento en la parte superior de la lancha; que ese día estaba algo nublado, llovíznaba, soplaba brisa fuerte y el mar estaba "picado"; que los tripulantes de la lancha, no obstante las condiciones del tiempo, permitieron que el menor y otras personas se sentaran en la parte superior de la lancha, sin advertirles del peligro que corrían al así hacerlo; que uno o dos minutos después de haber salido la aludida lancha de Cataño para San Juan y como a cuarenta metros de distancia del muelle a que ésta había estado atracada, sopló una turbonada que desmanteló la lancha y lanzó al mar la capota que cubría su parte superior, la caja de los salvavidas, al menor Angel David Camacho y el asiento que éste ocupaba; que la madera que sujetaba la capota estaba negruzca y como podrida; que los salvavidas cayeron a distancia del menor y aunque éste sabía nadar no pudo agarrarse de ellos; que

la lancha en ningún momento trató de socorrer al niño; que nadie se tiró a salvarlo y que como resultado de todo esto el menor pereció ahogado.

La prueba de la demandada fué al efecto de que al momento de salir la lancha con rumbo a San Juan, si bien es cierto que lloviznaba, la brisa y el oleaje no eran fuertes y nada hacía anticipar que hubiera riesgo en hacer la travesía; que debido a la llovizna se le recomendó a los pasajeros que no se sentaran en la parte superior de la lancha; que como unos dos minutos después de la lancha haber despegado de su muelle y cuando ésta se hallaba a corta distancia del mismo, súbita y repentinamente se desató una tromba marina o turbonada que la desmanteló; que inmediatamente que la gente gritó indicando que un niño había caído al agua se dió contramarcha al motor, se dirigieron al sitio donde se suponía había caído el menor y lo buscaron durante algunos minutos, pero en vista de que los pasajeros estaban alarmados y de que insistían en que la lancha regresara al muelle, así se hizo; que entonces los pasajeros se desmontaron y tomaron otra lancha; y que la lancha inmediatamente regresó al lugar donde cayó el niño, sin lograr encontrarlo.

Si bien ésa es a grandes rasgos la prueba aducida por las partes, es bueno hacer constar, sin embargo, que algunos de los testigos del propio demandante admitieron reiteradamente que antes de zarpar la lancha el oleaje era llevadero; que el viento que soplaba era moderado y que no había peligro en hacer la travesía; que en otras ocasiones en que ha habido viento intenso como ese día y más marejada las lanchas habían hecho el viaje y que la lancha trató de llegar hasta donde estaba el niño. También es conveniente exponer que el testigo *William D. Pratts,* Teniente Comandante de la Marina en el Servicio de Guardacostas, llamado por la demandada, declaró textualmente lo siguiente: "En ese día estaba yo a bordo de un barco mercante grande. Pude observar y ob-

servé cuidadosamente un fenómeno que llamamos remolino; es 'water spell' en inglés; puede llamarse en español 'remolino'; 'water spell' es turbonada. Los primeros indicios que pude observar personalmente fué cuando se empezó a formar encima del 'Club Náutico' de San Juan. . . . Este remolino. . . hizo. . . pequeños daños, destruyendo las capotas de embarcaciones que estaban directamente a través del barco donde yo estaba. . . después que ascendió, volvió súbitamente a descender y pasó por sobre Isla Grande y por sobre encima de la Bahía de San Juan. . . . pasó a través de la Bahía de San Juan; y entonces fué desbaratándose ";. . . "la fuerza céntrica del remolino es rápida, pero el progreso a través de un sitio determinado a otro, es lento''; que "eso fué por la mañana" y ". . . nosotros requerimos a todas las embarcaciones grandes que las capotas sean permanentes y no tan solamente permanentes, sino que los soportes y el equipo en construcción sea sólida. . . . En cambio, nosotros hemos requerido que estas otras embarcaciones como las de la Compañía Popular se construyan de manera que sus capotas en caso de que surja un viento fuerte de momento, o en forma de remolino, las coja a sus capotas el viento y se las lleve. Que todo el techo sea de una construcción ligera de manera que el viento se lo lleve antes de que se vuelque la lancha"; que la lancha número 5 "reunía todos los requisitos de nuestras reglas con referencia a ese tipo de embarcaciones"; y que la turbonada a veces se levantaba y volvía a caer sobre el mar y que es difícil decir cuánto tiempo fué visto ese fenómeno, si segundos o minutos.

También debe hacerse constar que *Edward Howard Marx,* Jefe del Negociado del Tiempo en Puerto Rico, quien igualmente depuso como testigo de la demandada, declaró que la velocidad promedio del viento durante el día del accidente fué de 12.8 millas por hora; que entre 8 y 9 de la mañana era de veinte millas pero que durante unos cinco minutos,

comenzando a las 8:40 de la mañana,(¹) llegó a cuarenta y cuatro millas y por un minuto llego a cuarenta y nueve millas por hora.

La anterior prueba, en conjunto, fué apreciada por la corte inferior y como resultado de la aquilatación que de la misma hizo llegó ella a la conclusión, conforme ya hemos indicado, de que se trataba de un accidente desgraciado.

Un acto de Dios o de fuerza mayor (*Act of God or Vis Mayor*) es algo que se ocasiona exclusivamente por la violencia de la naturaleza, por una fuerza de los elementos que la capacidad humana no puede prever ni impedir, como por ejemplo por un relámpago, un tornado, una tromba marina, un huracán o por cosas similares. *New Brunswick Steamboat & Canal Transp. Co.* v. *Tiers,* 24 N. J. Law 697, 714, 64 Am. Dec. 394; *The Majestic,* 17 S. Ct. 597, 602, 166 U. S. 375, 41 L. Ed. 1039; *Davis* v. *Ivey,* 112 So. 264, 272; *Hays* v. *Kennedy,* 41 Pa. 378, 380, 80 Am. Dec. 627; *London Guarantee & Accident Co.* v. *Industrial Accident Commission of California,* 259 P. 1096; *Bradley* v. *City of Seattle,* 294 P. 554, 556; *Brousseau* v. *The Hudson,* 11 La. Ann. 427, 428; *The George Shiras,* 61 Fed. 300, 301, 9 C.C.A. 511.

El demandante admite, repetimos, que la citada turbonada, por ser un acto de Dios, estaba fuera del alcance de la demandada, pero alega que la muerte del menor Angel David Camacho se debió a la culpa y negligencia de la apelada. La prueba fué contradictoria. La corte dirimió el conflicto y llegó a la conclusión de que la apelada no había incurrido en tal culpa o negligencia. No se nos ha demostrado que en esto cometiera manifiesto error, ni que actuara movida por pasión, prejuicio o parcialidad. *Asencio* v. *Am. Railroad Co.,* 66 D.P.R. 227; *Machuca* v. *Autoridad Fuentes Fluviales,* 66 D.P.R. 182 y *Hernández* v. *Acosta,* 64 D.P.R. 171, 178.

---

(¹)Para aquel entonces, por Boletín Administrativo del Gobernador de Puerto Rico, los relojes en esta isla se habían adelantado una hora.

Dispone nuestro Código Civil en su artículo 1058 (ed. 1930) que "nadie responderá de aquellos sucesos que no hubieran podido preverse, o que previstos, fueran inevitables," y en el artículo 1494 (ed. 1930) que "Responden igualmente los conductores de las pérdidas y averías de las cosas que reciben, a no ser que prueben que la pérdida o la avería ha provenido de caso fortuito o de fuerza mayor." Reconoce, pues, nuestro Código Civil que en aquellos casos en que la pérdida o el daño han sido ocasionados por causa inevitable, caso fortuito o fuerza mayor, el porteador está exento de responsabilidad.

Comentando el tratadista Manresa los artículos 1105 y 1602 del Código Civil español, equivalentes a los artículos 1058 y 1494 del nuestro, se expresa así:

"Dentro del concepto general y común del *caso fortuito,* se comprenden éste propiamente dicho y la *fuerza mayor,* y tanto aquél como ésta pueden ser ordinarios o extraordinarios. La diferencia entre aquellas dos especies es sencilla: el *caso fortuito,* como tal, es independiente, no sólo de la voluntad del deudor, sino de toda voluntad humana; la *fuerza mayor* procede de un acontecimiento inevitable, o del acto, legítimo o ilegítimo, de persona distinta de la obligada, que supone para ésta la imposibilidad de cumplir su obligación."

"  .      .      .      .      .      .      .      .

"El transporte, jurídicamente considerado, puede ser . . . . tanto de personas como de cosas, y puede realizarse por agua o por tierra." Manresa, Comentarios al Código Civil, Tomo VIII, ed. 1929, pág. 85, y Tomo X, ed. 1931, pág. 693.

Luego de definir la frase "fuerza mayor", en tanto en cuanto la misma es aplicable al derecho civil, la Enciclopedia Jurídica Española, por Francisco Seix, nos dice en la pág. 844 del Tomo 16, lo siguiente:

"Siguiendo la doctrina general de las escuelas, la jurisprudencia del Tribunal Supremo ha venido a sentar en el Derecho español los requisitos que deben concurrir en la fuerza mayor para dar lugar a la liberación de responsabilidad por el incumplimiento de las obligaciones contraídas, los cuales son a su tenor: *a)* ser el hecho origen

de la fuerza mayor, imprevisto e inevitable y no imputable al deudor, y *b*) estar tan íntimamente ligado con la obligación, que sea en realidad causa obstativa para su cumplimiento; estableciendo asimismo que, para ser tenida en cuenta, debe probarse su existencia, cuya prueba corresponde verificar al que la alegue, y que la determinación de si un hecho produce en derecho los efectos de la fuerza mayor, contiene una apreciación jurídica de la exclusiva incumbencia del Tribunal sentenciador.''

Si conforme la prueba demostró, al salir la lancha de Cataño el viento era moderado; si el oleaje era llevadero; si en otras ocasiones las lanchas de la demandada habían hecho la misma travesía con viento tan intenso como ese día y con más marejada; si la capota de la lancha se desprendió debido a la súbita turbonada y a que la naturaleza de la embarcación requería que la construcción de la capota fuera frágil; si la lancha dió contramarcha y fué en auxilio del menor; y si la causa primordial del accidente fué la turbonada que describió el Comandante Pratts, la corte a quo estuvo plenamente justificada en llegar a la conclusión que llegó. Bajo esas circunstancias, ella no cometió error al dictar sentencia en la forma en que lo hizo.

*Debe confirmarse la sentencia apelada.*